apartment all the time, and because he didn't have a phone in his apartment. NT Vol. IV at 567.

76.     All of the forensic evidence that could be identified from the crime scene matched or belonged either to the homicide victims, Mr. Lugo and Ms. Ascencio, or to Milton Montalvo, the Petitioner's brother. Testimony of Pennsylvania State Police serological chemist Chris Arrotti, NT Vol. VI at 1003-05, 1009; testimony of Pennsylvania State Police DNA analysis supervisor Beth Ann Giles, NT Vol. VI at 1034.

77.     In addition, during Milton Montalvo's trial, one of the Commonwealth's witnesses, indeed, the only witness who presented direct inculpatory evidence against this Defendant, Noel Matos Montalvo, failed to appear and a bench warrant had to be issued to arrest Esther Soto and bring her to court. NT Vol. V at 874.

78.     At Milton Montalvo's trial, Esther Soto testified that she didn't remember anything, see, e.g., NT Vol. VI at 951, 952, 953, 954, et. seq., and recanted the statements she made to law enforcement, explaining that Detective Comacho threatened to take her business and send her to jail and keep her from seeing her children, so she was forced to say what she said on audiotape during the investigation of this offense. NT Vol. VI at 957. Ms. Soto testified that Detective Comacho told her everything that happened with regard to the murders of Miriam Ascencio and

37

Nelson Lugo before she made any statement to Detective Comacho.  NT Vol. VI at 980-81.

79.    During closing argument, the prosecutor argued that "someone" knocked the glass out of the back door window of Miriam Ascencio's apartment, and that person's blood was deposited on the mini-blinds to that window, and that blood belonged to the defendant in that case – Milton Montalvo.  NT Vol. VII at 1204-05. He argued that "someone was there to violate Miriam Ascencio, to slowly drag a knife across her neck; and while she lived, to take the knife and put it right in her eye. Someone had a heck of a lot of anger against Miriam Ascencio . . .[t]hen someone, still out of anger, took a shoe and violated Miriam Ascencio again; and that someone was the Defendant (Milton Montalvo)."  NT Vol. VII at 1205-06.

80.    Later he told the jury, "Esther Soto met with the Defendant (Milton Montalvo) right after he killed Miriam and Mr. Santana (aka Lugo).  NT Vol. VII at 1212.  The prosecutor also told the Milton Montalvo jury, during closing argument, that Esther Soto was a liar, saying, "what Esther Soto said to you the other day was a lie." Ibid.

81.    The prosecutor asked the jury rhetorically, during his closing argument, "Why does when he leave for Florida on the 19th he (Milton Montalvo) need to change his name?  Because the Defendant (Milton Montalvo) knows that he killed

38

Miriam and Manuel (Santana).  Because the Defendant (Milton Montalvo) is guilty of those crimes and his consciousness is speaking through his actions."  NT Vol. VII at 1213-14.

82.     As to the guilt of Petitioner, Noel Montalvo, the prosecutor said this to the Milton Montalvo jury, "***Nothing that you've heard indicates that his brother was involved other than the statement of Esther Soto*** . . .".  NT Vol. VII at 1217.

83.     Having heard this evidence, the arguments, and the judge's instructions, the jury convicted Milton Montalvo of the first degree murder of Miriam Ascencio, and first degree murder of Manuel Nelson Lugo Santana.  NT Vol. VIII at 1268.

84.     At the penalty phase of Milton Montalvo's trial, the Commonwealth submitted, *inter alia*, the statutory aggravating circumstances of killing committed during the perpetration of a felony (burglary) – 42 Pa. C.S.A. §9711(d)(6); killing committed by means of torture – 42 Pa. C.S.A. §9711 (d)(8); and that defendant committed multiple murders – 42 Pa. C.S.A. §9711(d)(11) as to the murder of Miriam Ascencio, and the statutory aggravating circumstances of .killing committed during the perpetration of a felony (burglary) – 42 Pa. C.S.A. §9711(d)(6); and that defendant committed multiple murders – 42 Pa. C.S.A. §9711(d)(11) as to the murder of Nelson Lugo. NT Penalty Phase of Milton Montalvo, at 14.

85.    During his opening statement at Milton Montalvo's penalty phase, the prosecutor began by noting that "the Defendant is the killer of Miriam Ascencio. . . . He is the killer of Manuel Santana." NT Penalty Phase of Milton Montalvo, at 21.

86.    The prosecutor knew, or should have known, that the aggravating circumstances he submitted in the deaths of Miriam Ascencio and Manuel Nelson Lugo Santana have been interpreted by the Pennsylvania Supreme Court as applying to an **actual** killer, not an accomplice.  See, e.g., Commonwealth v. Lassiter, 722 A.2d 657 (Pa. 1998); Idaho v. Lankford, 500 U.S. 110 (1991) (application of aggravating circumstance more questionable if defendant not the actual killer).  By seeking these circumstances, the prosecution essentially conceded that Noel Montalvo was not the actual killer.

87.    During a colloquy outside of the jury's presence about the submission of the (e)(7) mitigating circumstance; to-wit, "the defendant's participation in the homicidal act was relatively minor," 42 Pa. C.S. §9711(e)(7), the trial judge said: "Actually, the only evidence to even put his brother (Petitioner, Noel Montalvo) in the apartment is the statement by Esther Soto," to which the prosecutor responded, "Right.  Exactly.  *And nothing to corroborate that whatsoever*."  NT Penalty Phase of Milton Montalvo at 180.

40

88.     The jury found these aforementioned aggravating circumstances in the penalty phase of the trial as to these two murders.  NT Penalty Phase of Milton Montalvo at 191, 194.

89.     During Petitioner's trial, the prosecutor disregarded the verdicts in the Milton Montalvo case, verdicts that made specific findings about Milton Montalvo as the killer of Miriam Ascencio and Manuel Nelson Lugo Santana.

90.     Petitioner was acquitted of the first degree murder of Manuel Nelson Lugo Santana and convicted of second degree murder as to him.  NT Vol. V at  45. Petitioner was convicted of the first degree murder of Miriam Ascencio.  NT Vol. V at 44-45.

91.     In spite of the prosecutor's acknowledgment during the Milton Montalvo trial that the only evidence even suggesting that Petitioner Noel Montalvo was in Miriam Ascencio's apartment came from Esther Soto, and that this information was wholly uncorroborated, see ¶ 108, *infra*, the prosecutor told Petitioner's jury in his opening statement that "the victims in this case were murdered at the hand of this Defendant and his brother Milton Montalvo.  That Defendant and Milton Montalvo you will learn slaughtered Miriam Ascencio and Nelson Lugo."  NT Vol. II 109.

92.     Contrary to his theory of the case during Milton Montalvo's trial –  that Milton was angry at his former girlfriend Miriam Ascencio for breaking up with him

and for taking Manuel Nelson Lugo Santana as a new lover – in Petitioner's trial the prosecutor suggested that it was Petitioner, Noel Montalvo, who had a grudge against Miriam Ascencio because "Miriam knew that he (Petitioner) had escaped from parole in Puerto Rico because the Defendant at that time was living in this country under an alias having escaped from parole for automobile theft in Puerto Rico and Miriam knew all the details of that. Miriam this Defendant knew could put him back in prison in Puerto Rico. She knew too much." NT Vol. II at 111.

93.    The prosecutor knew, from the earlier trial of Milton Montalvo, that the residents of other apartments at 233 East Philadelphia Street in York, heard the voice of Milton Montalvo, Petitioner's brother, both inside and outside Miriam Ascencio's apartment on the night of the murders, and clearly identified the sole voice they heard as Milton Montalvo's, but during his opening statement in Petitioner's trial, he didn't tell the jurors that. Instead, he told them that those witnesses "heard **someone** saying, "I saw someone go in there; let me in." NT Vol. II at 111.

94.    As in Milton's, trial, the forensic evidence available to the Commonwealth and presented at Petitioner's trial tied the crime only to Milton Montalvo, Petitioner's brother; there was NO forensic evidence linking these crimes to Petitioner. *See, e.g.*, Opening Statement of Assistant District Attorney Kelley, NT Vol. II at 118 ("And play [sic] particular attention to the forensic evidence because

42

the Defendant's blood was not found on the crime scene, only his brother's blood was found on the crime scene . . .").

95.    Detective Scott Michael Hose, a crime scene technician for the York Police Department, reluctantly testified that there was nothing forensically linking Noel Montalvo to this crime.  NT Vol. IV, at 70-71.  Chris Ann Arrotti, a forensic serologist for the Pennsylvania State Police Crime Laboratory in Greensburg, Pennsylvania, likewise testified that there was nothing in the serology submissions from the crime scene in this case that was consistent with Petitioner NT Vol. IV at 138.  Beth Ann Giles, a supervisor at the Pennsylvania State Police DNA Laboratory in Greensburg, Pennsylvania,  testified that none of the items submitted to her in this case during the course of the investigation ever came back matching Petitioner Noel Montalvo.  NT Vol. IV at 157.

96.    Despite this dearth of evidence against Petitioner, and in spite of the prosecutor's acknowledgment, during the Milton Montalvo trial, that the only evidence against Petitioner Noel Montalvo was the incredible testimony of Esther Soto without any corroboration whatsoever, and his prior theory that these murders were motivated by Milton Montalvo's anger at his former girlfriend, the prosecutor argued to the jury that Petitioner, "after Milton had killed the male, took the knife, severed her major arteries in her throat and stabbed her in the eye."  NT Vol. IV at

310.

97.     For a prosecutor to assert, as to the same set of facts, that one thing is true in a trial against one confederate, and that a contrary thing is true in a trial against another confederate, is a violation of the due process clause of the Fourteenth Amendment. Jacobs v. Scott, 513 U.S. 1067 (1995) (Stevens, J. dissenting from the denial of cert.) ("I have long believed that serious questions are raised 'when the sovereign itself takes inconsistent positions in two separate criminal proceedings against two of its citizens.' The 'heightened need for reliability' in capital cases only underscores the gravity of those questions in the circumstances of this case.") (citations omitted). *See also*, ANNE BOWEN POULIN, Prosecutorial Inconsistency, Estoppel, and Due Process: Making the Prosecution Get Its Story Straight, 89 Cal.L.Rev. 1423 (2001).

98.     In Bradshaw v. Stumpf, 545 U.S. 175 (2005), the United States Supreme Court remanded the case to the United States Court of Appeals for the Sixth Circuit for an analysis of whether the prosecutor's use of inconsistent theories affected the capital sentencing proceeding in the petitioner's case, in violation not only of the due process clause of the Fourteenth Amendment but in violation of the Eighth Amendment's cruel and unusual punishments clause as well, suggesting, of course, that there was at least a possibility of reversible error on account of the prosecutor's

use of inconsistent theories.

99.   That is precisely what occurred here and Petitioner's Sixth Eighth and Fourteenth Amendment rights were violated.  <u>See, e.g.</u>, Smith v. Groose, 205 F.3d 1045 (8th Cir. 2000) (holding that inconsistent theories at codefendants' separate trials violated due process); In re Sakarias, 106 P.3d 931, 934 (Cal. 2005) ("We agree with Sakarias that the prosecutor violated his due process rights by intentionally and without good faith justification arguing inconsistent and irreconcilable factual theories in the two trials, attributing to each petitioner in turn culpable acts that could have been committed by only one person. We also agree this violation prejudiced Sakarias, entitling him to relief.").  <u>See also</u>, Thompson v. Calderon, 120 F.3d 1045, 1058 (9th Cir. 1997) (*en banc*), *rev'd on other grounds*, 523 U.S. 538 (1998) (Ninth Circuit ordered habeas relief in a capital case based on ineffective assistance of counsel at the guilt phase of a capital trial, but a plurality of the en banc majority noted that it would also have reversed on the prosecution's use of inconsistent theories in the separate trials of co-defendants as a violation of due process.).

100.   Trial counsel's failure to object on these grounds constituted ineffective assistance of counsel, in violation of the Sixth, Eighth and Fourteenth Amendments. Counsel had no reasonable strategy to forego such an objection that would have precluded Petitioner's capital prosecution.  Indeed, much of counsel's strategy at

45

Petitioner's trial was to establish for the jury that the crime was committed by Petitioner's brother, Milton Montalvo, and there was no credible evidence linking Petitioner to the crime at all.

101.   Trial counsel's failure to raise and litigate this claim was clearly prejudicial, for such an objection should have resulted in an estoppel of a prosecutorial argument that Petitioner was a principal actor in this offense; at best, the Commonwealth should have been limited to presenting a case that Petitioner was a co-conspirator and/or an accomplice in these murders.   As such, it would have limited Petitioner's culpability in the jury's eyes, and affected the Commonwealth's ability to submit aggravating circumstances in any penalty phase if the jury convicted Petitioner of first degree murder at all.

102.   Direct appeal counsel was precluded from raising the above-described claims of ineffective assistance of counsel on direct appeal.   See Commonwealth v. Grant, 813 A.2d 726 (Pa. 2002).   To the extent that counsel should have and could have raised the above-described claims on direct appeal under controlling precedent and procedure, counsel's failure to do so constitutes ineffective assistance of counsel in violation of the Sixth, Eighth, and Fourteenth Amendments.

103.   The courts "long have referred" to national standards such as the *American Bar Association Standards for Criminal Justice* and the *ABA Guidelines*

*for the Appointment and Performance of Counsel in Death Penalty Cases* "as 'guides to determining what is reasonable.'" Wiggins v. Smith, 539 U.S. at 524 (quoting Strickland v. Washington, 466 U.S. at 688); Rompilla v. Beard, 545 U.S. at 387 & n.7. These norms unquestionably apply to counsel's performance on direct appeal in this case. E.g., Wiggins, 539 U.S. 510 (2003) (applying ABA Standards and Maryland local norms to counsel's performance at trial in 1989); Rompilla, 545 U.S. 374 (2005) (applying ABA Standards to counsel's performance in November 1988 trial); Williams, 529 U.S. 362 (2000) (applying ABA Standards to counsel's performance in 1986 trial).

104.   The *ABA Guidelines* "in circulation at the time of [Petitioner's direct appeal] describe[ ] the obligation in terms no one could misunderstand in the circumstances of a case like this one," Rompilla, 545 U.S. at 387: "[a]ppellate counsel should seek, when perfecting an appeal, to present all arguably meritorious issues." AMERICAN BAR ASSOCIATION GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN CAPITAL CASES, Guideline 11.9.2.(D), *Duties of Appellate Counsel* (1989 ed.). As the *Commentary* to this Guideline clearly explained (emphasis in original):

> Traditional theories of appellate practice notwithstanding, appellate counsel in a capital case should <u>not</u> raise only the best of several potential issues. . . . When a client will be killed if the case is lost,

counsel (and the courts) should not let any possible ground for relief go unexplored or unexploited.

See also AMERICAN BAR ASSOCIATION GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN CAPITAL CASES, Guideline 10.15.1.(C), *Duties of Post-Conviction Counsel*[13] (2003 rev. ed.) (appellate "counsel should seek to litigate all issues, whether or not previously presented, that are arguably meritorious"); id. *Comment, Direct Appeal* ("[I]t is of critical importance that counsel on direct appeal proceed . . . in a manner that maximizes the client's ultimate chances of success. . . . When a client will be killed if the case is lost, counsel should not let any possible ground for relief go unexplored or unexploited.").

105.   The failure to raise or litigate meritorious claims on appeal, like those presented here, constitutes prejudicially deficient performance under federal constitutional law.  E.g., Mason v. Hanks, 97 F.3d 887, 892 (7th Cir. 1996) (appellate counsel was ineffective for failing to raise claim relating to the erroneous admission of hearsay evidence); Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994) (appellate counsel ineffective for failing to raise issue relating to state discovery rule); Matire v. Wainwright, 811 F.2d 1430, 1435 (11th Cir. 1987) (appellate counsel ineffective

---

[13]The 2003 Guidelines include direct appeal counsel under the discussion of post-conviction counsel, which applies to all counsel who enter a case after the time of conviction.

for failing to raise claim relating to comment on defendant's post arrest silence).  A defendant establishes prejudice from appellate counsel's ineffectiveness where he shows that, but for counsel's error, there was a reasonable probability that the outcome of the appeal would have been different.  Mason, 97 F.3d at 893; Mayo, 13 F.3d at 534; Matire, 811 F.2d at 1439.  Since there is a reasonable likelihood he would have won the appeal had he fully and properly raised this issue, Petitioner has proven prejudice.

**CLAIM III.   AS A RESULT OF COURT ERROR, PROSECUTORIAL MISCONDUCT AND INEFFECTIVE ASSISTANCE OF COUNSEL, THE JURY WAS EXPOSED TO CONSTITUTIONALLY PROHIBITIVE IDENTIFICATION TESTIMONY IN VIOLATION OF PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.**

106.   The claims and factual allegations set forth in all other sections of this *Petition* are incorporated by reference and realleged as if set forth entirely herein.

107.   During trial the prosecution elicited testimony from Nici Negron that Petitioner was the male he saw in Milton Montalvo's van on the evening of the murder.  NT Vol. II at 195.  The police paperwork indicated that Mr. Negron could not – and did not – identify the male in the van nor was there any indication from the pretrial discovery that the prosecution either conducted a proper identification procedure pretrial or that the prosecution intended to elicit identification evidence through Mr. Negron's testimony.  During the direct examination, however, the

49

prosecutor asked Mr. Negron to identify Petitioner as the male inside the van on the evening of the murder. Id.  The admission of this evidence absent any pretrial notice whatsoever violated Petitioner's federal constitutional rights to due process, notice and an opportunity to present defense evidence.  Moreover, counsel's failure to object when the prosecution asked the identification questions, as well as his failure to request any and all identification procedures pretrial; and his failure to move to preclude and/or suppress any identification testimony by Mr. Negron constituted ineffective assistance of counsel in violation of Petitioner's state and federal constitutional rights.

### A.   The Prosecution's Failure to Disclose

108.   All indications contained in the discovery were that Mr. Negron could not identify the male in the van.  By the time of trial, however, the prosecutor asked direct questions indicating that he knew that Mr. Negron would indeed identify Petitioner as the male in the van.  The prosecutor did not, however, provide counsel with notice of that intended identification pretrial thus depriving Petitioner of any opportunity to challenge the admission of Mr. Negron's inherently unreliable identification.

109.   There is no question that an individual accused of a crime has a right to notice of the charges and an opportunity to defend against those charges.  See Cole

v. Arkansas, 333  U.S. 196, 201 (1948); In re Oliver, 333 U.S. 257, 273 (1948);

Lankford v. Idaho, 500 U.S. 110, 126 n. 22 (1991) (in a "variety of contexts, [this

Court's] cases have repeatedly emphasized the importance of giving the parties

sufficient notice to enable them to identify the issues on which a decision may turn");

Morgan v. United States, 304 U.S. 1, 18 (1938) ("[T]he right to a hearing embraces

... a reasonable opportunity to know the claims of the opposing party and to meet

them").

110.   The core of this principle includes the also long-standing constitutional

requirement that a defendant must have a meaningful opportunity to contest issues

determinative of the state's case.  E.g., Crane v. Kentucky, 476 U.S. 683, 690 (1986)

(due process entities defendant to a "meaningful opportunity to present a complete

defense") (citations omitted); In re Gault, 387 U.S. 1, 34 (1967) ("one of the purposes

of notice is to clarify the issues to be considered"); Chambers v. Mississippi, 410 U.S.

284, 294 (1973) ("The right of an accused in a criminal trial to due process is, in

essence, the right to a fair opportunity to defend against the State's accusations.");

Davis v. Alaska, 415 U.S. 308 (1974); United States v. Cronic, 466 U.S. 648, 656

(1984); Strickland v. Washington, 466 U.S. 668, 684-685 (1984); California v.

Trombetta, 467 U.S. 479, 485 (1984); Rock v. Arkansas, 483 U.S. 44, 51 (1987).

Whether by court error, trial counsel's ineffectiveness, or prosecutorial misconduct,

the denial of these fundamental rights requires relief.

111.    Indeed, in civil and criminal cases alike, the United States Supreme Court has repeatedly held that "'[t]he fundamental requisite of due process of law is the opportunity to be heard.'" Goldberg v. Kelly, 397 U.S. 254, 267 (1970) (quoting Grannis v. Ordean, 234 U.S. 385, 394 (1914)).  See also In re Gault, 387 U.S. 1, 17 (1967) (describing the commonplace requirement of "notice of issues" in civil proceedings);  Windsor v. McVeigh, 93 U.S. 274, 277, 280 (1876);  In re Oliver, 333 U.S. 257, 273, 278 (1948);  Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314-15 (1950);  Covey v. Town of Somers, 351 U.S. 141, 146 (1956);  Dunn v. United States, 442 U.S. 100, 106 (1979).

112.    Likewise, due process is violated where the prosecution, (or court) misinform an accused regarding the nature of charges to the extent that it deprives the accused of any meaningful opportunity to present a defense.[14]

---

[14]For example, in Lankford, the prosecution disavowed any intention to seek the death penalty.  As a result, defense counsel did not address critical capital sentencing issues.  Lankford, 500 U.S. at 115. Nevertheless, the sentencing court imposed the death penalty.  Reasoning that "fair notice" of the issue to be tried is "the bedrock of any constitutionally fair procedure," id. at 121, the Court held that "inadequate notice concerning the character of the hearing frustrated counsel's opportunity to make an argument that might have persuaded the trial judge to impose a different sentence, or at least to make different findings than those he made." Id. at 124.  See also In re Ruffalo, 390 U.S. 544, 551, n.4 (1968) (adding further charges in disbarment proceedings after attorney and former employee testified violated due process because the attorney "may have been lulled 'into a false sense of security'"

52

113.   These principles flow from an even older and more fundamental doctrine requiring that the due process clause does not tolerate state action intentionally designed to mislead opposing counsel or the fact finder regarding determinative trial issues. E.g. Napue v. Illinois, 360 U.S. 264, 269 (1959) ("implicit in the concept of ordered liberty" is the due process requirement that the state not premise its case on the veracity of a particular witness who testifies falsely, while thwarting the defense's effort to challenge the witness' credibility); Mooney v. Holohan, 294 U.S. 103, 112 (1935) ("deliberate deception of court and jury . . . is inconsistent with rudimentary demands of justice"); United States v. Agurs, 427 U.S. 97, 104 (1976) (the prosecution's knowing use of false testimony involves "a corruption of the truth-seeking function of the trial process").  As the Supreme Court noted long-ago,

---

regarding the manner in which he could rebut the charges) (quoting Bouie v. City of Columbia, 378 U.S. 347, 352 (1964); Raley v. Ohio, 360 U.S. 423, 438 (1959) (informing witnesses called before the Ohio Un-American Commission that they could invoke the privilege against self-incrimination where state law precluded invocation of such a privilege, constituted "active misleading" precluding subsequent prosecution for contempt on the basis of the denial of due process); Johnson v. United States, 318 U.S. 189, 197 (1943) ("An accused having the assurance of the court that his claim of privilege would be granted might well be entrapped if his assertion of the privilege could then be used against him.... Elementary fairness requires that an accused should not be misled on that score"); Smith v. Estelle, 602 F.2d 694 (5th Cir.1979), aff'd on other grounds, 451 U.S. 454 (1981) ("Surprise can be as effective as secrecy in preventing effective cross-examination, in denying the 'opportunity for [defense] counsel to challenge the accuracy or materiality of evidence, and in foreclosing 'that debate between adversaries [which] is often essential to the truth-seeking function of trials'")(quoting Gardner v. Florida, 430 U.S. at 357, 360).

the state's "interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done. . . . It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." Berger v. United States, 295 U.S. 78, 88 (1935).

114.   Each of these principles are even more compelling in light of the heightened safeguards required in capital cases.   See, e.g., Beck v. Alabama, 447 U.S. 625 (1980); Caldwell v. Mississippi, 472 U.S. 320 (1985).

115.   The record demonstrates, and Petitioner avers, that the prosecution knew before Petitioner's trial that Mr. Negron would identify Petitioner, yet, the prosecution did not provide the defense with any notice and failed to correct the previously provided discovery documents clearly indicating that Mr. Negron could not make any such identification.  As a result, Petitioner was unable to challenge the admission of that testimony on the basis of the inherent unreliability of the in-court identification and/or the suggestivity of any pretrial identification procedures conducted by the police or the prosecution.[15]   By lulling the defense into believing that there would be no identification by Mr. Negron and then eliciting that testimony

---

[15]The prosecution's failure to disclose any and all identification procedures also violated Rule 573 (B)(1) (d) of the Pennsylvania Rules of Criminal Procedure.

without any prior notice, the Commonwealth violated Petitioner's Sixth, Eighth and Fourteenth Amendment rights.  For each of the reasons, Petitioner is entitled to relief.

### B.    Counsel was Ineffective

116.   To the extent that counsel should have known that Mr. Negron would identify Petitioner, despite the prosecution's failure to disclose that identification and the Commonwealth's materially misleading pretrial discovery, counsel was ineffective for failing to move to suppress that identification pretrial.

117.  It is well recognized that eyewitnesses are prone to erroneous identifications. United States v. Wade, 388 U.S. 218, 228 (1967) ("The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification . . . [t]he identification of strangers is proverbially untrustworthy.").  Here, the identification could not be conducted in any more suggestive circumstances.  Petitioner was the only person sitting at the defense table, he was the accused and there had been a considerable amount of press reports prior to his trial regarding his arrest and apprehension that included photographs of Petitioner.  Where, as here, there is no record of any prior identification conducted under non-suggestive circumstances, there is no question that Mr. Negron's identification of Petitioner was constitutionally unreliable.

118.   Because of the inherent dangers of identification testimony and the possibility of misidentification, the Court in Wade and its progeny has recognized that such concerns implicate the Due Process Clause:   "It is the likelihood of misidentification which violates a defendant's right to due process." Neil v. Biggers, 409 U.S. 188, 198 (1972), and "**reliability** is the linchpin in determining the admissibility of identification testimony," Manson v. Braithwaite, 432 U.S. 98, 114 (1977).

119.   To determine reliability, courts examine the pretrial identification in light of the "totality of the circumstances," United States v. Emanuele, 51 F.3d 1123, 1128 (3d Cir. 1995), such circumstances include:

> 1) the opportunity of the witness to view the defendant at the time of the crime; 2) the witness' degree of attention; 3) the accuracy of the witness' description of the defendant; 4) the witness' level of certainty at the time of the confrontation; and 5) the length of time elapsed between the time of the crime and the confrontation.

Biggers, 409 U.S. at 199-200; Manson, 432 U.S. at 114.

120.   Here, Mr. Negron's in-court identification fails on every count.  He observed the male inside the van in the dead of night.  Even when the male was purportedly outside the van, Mr. Negron's observations were from a distance and in the dark. His opportunity to view the male inside the van was limited.  He viewed the individual for just a few moments in the dark while the individual sat inside the van

or was standing on a dark street.  He gave no description at all of this male to the police.  His identification testimony occurred years later after Petitioner's name and picture were in press reports following his apprehension and arrest.  While he may have testified that he was certain that Petitioner was the individual, that testimony is skewed by the inherently suggestive circumstances of the in-court identification.  Under these circumstances, Mr. Negron's identification testimony fell far below the level of reliability necessary to withstand constitutional scrutiny and counsel's failure to move to suppress any identification by Mr. Negron constitutes ineffective assistance of counsel under both state and federal law.

121.   Moreover, even if counsel was not ineffective for failing to predict that the prosecution would sandbag the defense with an in-court identification after providing pretrial discovery that failed to indicate any identification would occur, once the prosecution began eliciting the identification evidence, counsel should have objected, moved for a mistrial and/or moved for a recess to conduct a full hearing on the constitutionality of admitting the testimony.  As set forth above, the in-court identification failed to meet the reliability requirements and, as a result, its admission violated Petitioner's federal constitutional rights.  Counsel could have no strategic reason for allowing the jury to hear the inherently unreliable identification.  Where, as here, the prosecution relied on the testimony placing Petitioner in the company of

Milton Montalvo near the time of the murder as a basis for finding Petitioner guilty, prejudice is demonstrated and relief is required.  Where, as here, the prosecution had no physical evidence – or any other competent evidence – connecting Petitioner to these crimes, the denial of Petitioner's federal constitutional rights is manifest and requires grant of relief, or at a minimum, an evidentiary hearing.

### CLAIM IV.   PETITIONER'S ARREST WAS ILLEGAL, IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS.

122.   The claims and factual allegations set forth in all other sections of this *Petition* are incorporated by reference and realleged as if set forth entirely herein.

123.   At Petitioner's trial, the Commonwealth presented evidence that Petitioner was arrested by, *inter alia*, Special Agent William Edges of the Federal Bureau of Investigation.  NT Vol. III, at 95-96.  Petitioner's arrest was premised on a federal charge of unauthorized flight to avoid prosecution; without this charge, Special Agent Edges and other FBI Special Agents would have had no jurisdiction to participate in the investigation for Petitioner.  Id. at 87-88.

124.   Unauthorized flight to avoid prosecution is a specific intent crime.  See 18 U.S.C. §1073, "Whoever moves or travels in interstate or foreign commerce with intent either (1) to avoid prosecution, . . .".  See United States v. Frank, 864 F.2d 992 (3rd Cir. 1992), *cited in* 58 Am.Jur.2d Obstructing Justice §73.

125.   In order to effect a valid arrest, the federal government must have some evidence from which to believe that the suspect had this intent; mere absence from a state is not sufficient to establish probable cause to arrest.  State v. Miller, 412 P.2d 240 (N.M. 1966), *cited in* 58 Am.Jur.2d Obstructing Justice §73.

126.   Neither Special Agent Edges, nor any other Commonwealth witness at Petitioner's trial, established probable cause to believe that Petitioner fled York County, and the Commonwealth of Pennsylvania, with the intent to avoid prosecution for the murders of Miriam Ascencio and Nelson Lugo.

127.   The defense sought to cross-examine Special Agent Edges about whether or not he had reason to believe that Petitioner left Pennsylvania with the specific intent to avoid prosecution, but the objection to this line of questioning was sustained by the trial court.  NT Vol. III at 102-03.

128.   Petitioner was questioned during custodial interrogation by Detective Roland Comacho in the Hudson County prison in New Jersey on August 7, 2002 at approximately 4:47 p.m., one day after Petitioner was arrested by, *inter alia*, Special Agent Edges of the FBI.  NT Vol. IV at 208-09.

129.   During that custodial interrogation, Petitioner allegedly told Detective Comacho that he left York County, Pennsylvania because he was concerned that Jaime Cancel, Miriam Ascencio's son, would tell the authorities that Petitioner had

59

violated his probation in Puerto Rico. NT Vol. IV at 209.

130.    This explanation, attributed to Petitioner by Detective Comacho, conflicted with Petitioner's own testimony, NT Vol. V at 79, and should have been suppressed by the trial court as "fruit of the poisonous tree," e.g., fruit of an illegal arrest.  See, e.g., Taylor v. Alabama, 457 U.S. 687 (1982); Brown v. Illinois, 422 U.S. 590 (1975).

131.    Trial counsel's failure to challenge Petitioner's arrest and subsequent custodial statement constitutes ineffective assistance of trial counsel.  Petitioner was arrested on a federal authorized flight to avoid prosecution charge without any evidence that Petitioner in fact left the Commonwealth of Pennsylvania for that reason.   Indeed, the Commonwealth's own evidence, which should have been suppressed as a fruit of the poisonous tree, *see infra*, established at best that Petitioner left the Commonwealth to avoid apprehension for fleeing Puerto Rico on a probation violation; there was no evidence presented suggesting that law enforcement had probable cause to believe that Petitioner fled the Commonwealth to avoid arrest for a homicide or homicides. Yet, counsel failed to challenge either Petitioner's arrest as illegal, or the introduction of his custodial statement as fruit of the poisonous tree, in spite of that statement conflicting with Petitioner's in-court testimony.

132.    Counsel's performance was deficient.    Counsel had no reasonable strategy for his failures to challenge Petitioner's illegal arrest or the introduction of his custodial statement as fruit of the poisonous tree.    Since Petitioner testified at the penalty phase, it was clearly a part of the strategy for his testimony to be credible. Any evidence that contradicted his testimony that could be suppressed, counsel reasonably would want to be suppressed.    Counsel was obviously thinking this way because counsel did seek to challenge Special Agent Edges about the basis for his arrest of Petitioner, but that challenge was prohibited by the trial court on the Commonwealth's relevance objection.    The trial court invited defense counsel to re-call Special Agent Edges to the witness stand in the defense case in chief; defense counsel failed to do so.    Of course, presenting Special Agent Edges during the defense case in chief would not have prevented the jury from hearing an alleged version of why the Petitioner left York that was in conflict with Petitioner's version from the witness stand, but trial counsel at no point moved to suppress Petitioner's in-custody statement to Detective Roland Comacho.

133.    By failing to challenge Petitioner's illegal arrest, and the fruit of that arrest; to-wit, his custodial statement to Detective Comacho, the jury was presented with two different versions of why Petitioner left York County – in the custodial statement to Detective Comacho, Petitioner allegedly told Comacho that he left York

61

for fear that Miriam Ascencio's son, Jaime Cancel, would report him to the authorities as a probation violator from Puerto Rico. NT Vol. IV at 209. By contrast, when Petitioner took the witness stand, he told the jury that he left York for Miami in search of a better paying job. NT Vol. V at 79. Indeed, Petitioner flatly denied that his violation of probation in Puerto Rico had anything to do with his leaving York County, Pennsylvania. Id. Trial counsel had an opportunity to remove this conflicting testimony by challenging Petitioner's arrest and the fruits thereof, but failed to do so.

134. Direct appeal counsel was precluded from raising the above-described claims of ineffective assistance of counsel on direct appeal. See Commonwealth v. Grant, 813 A.2d 726 (Pa. 2002). To the extent that counsel should have and could have raised the above-described claims on direct appeal under controlling precedent and procedure, counsel's failure to do so constitutes ineffective assistance of counsel in violation of the Sixth, Eighth, and Fourteenth Amendments. Appellate counsel's failure to raise on appeal trial counsel's preclusion from inquiring of Special Agent Edges about the basis for his arrest of Petitioner has arguable merit, was not based on a reasonable strategic judgment, and was prejudicial to Petitioner, as chronicled above. For each of the reasons, Petitioner is entitled to relief.

62

CLAIM V.   THE ADMISSION OF DETECTIVE COMACHO'S SUMMARY OF PETITIONER'S PURPORTED STATEMENT TO THE POLICE AFTER HIS ILLEGAL ARREST VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.

135.   The claims and factual allegations set forth in all other sections of this *Petition* are incorporated by reference and realleged as if set forth entirely herein.

136.   At trial, the prosecution elicited Detective Williams' summary of Petitioner's post-arrest statement to Detective Comacho.  As noted above, because Petitioner's arrest was illegal, the admission of the summary of Petitioner's statement violated Petitioner's Sixth, Eighth and Fourteenth Amendment rights.  As set forth below, even if the summary of the statement was not precluded as a result of Petitioner's illegal arrest, the admission of Detective Comacho's testimony violated Petitioner's federal constitutional rights.

### A.   Admission of the Summary of Petitioner's Statement Violated Petitioner's Sixth Amendment Rights.

137.   The Commonwealth filed the complaint against Petitioner on December 22, 1998 and issued the arrest warrant on Petitioner on December 23, 1998. Petitioner was arrested on that warrant on August 6, 2002.  The adversarial proceedings had begun and Petitioner invoked his Sixth Amendment.

138.   As the procedural history demonstrates, Petitioner's right to counsel under the Sixth Amendment had attached before the police initiated the interrogation.

63

See Brewer v. Williams, 430 U.S. 387, 398 (1977) (noting that the Sixth Amendment right to counsel attaches "at or after the time that judicial proceedings have been initiated against him 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment'" (citing Kirby v. Illinois, supra, 406 U.S. 682, 689 (1972)); Rothgery v. Gillespie County     U.S.   , 128 S. Ct. 2578, 2592 (2008) ("a criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel"); Commonwealth v. McCoy, 975 A.2d 586, 590 (2009). Also as the record demonstrates, Petitioner invoked his right to counsel.

139.   Where, as here, Petitioner invoked his Sixth Amendment right to counsel, the police were precluded from initiating the interrogation. E.g. Maine v. Moulton, 474 U.S. 159, 170-71 (1985) ("Once the right to counsel has attached and been asserted, the State must of course honor it. This means more than simply that the State cannot prevent the accused from obtaining the assistance of counsel. The Sixth Amendment also imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek this assistance").

140.   Nor are these violations remedied by Petitioner's purported waiver of his rights, (see Trial Exhibit 58). Because Petitioner invoked his rights, the waiver is

invalid.  Massiah v. United States, 377 U.S. 201 (1963).  Accordingly, the police-initiated interrogation violated Petitioner's Sixth and Fourteenth Amendment rights and, as a result, Detective Comacho's testimony summarizing Petitioner's statement was inadmissible.  Relief is required.

141.  Counsel's failure to raise and litigate this clear basis justifying precluding admission of the summary of Petitioner's statement constitutes ineffective assistance of counsel under state and federal law and also entitles Petitioner to relief. Counsel's performance was deficient.  There can be no reasonable  strategic basis for failing to move to preclude evidence that the prosecution clearly used as a basis for finding Petitioner guilty.  Similarly, as the jury relied on Detective Comacho's testimony in reaching their guilt and sentencing determination, prejudice is demonstrated.  Accordingly, Petitioner has demonstrated his entitlement to relief under the Sixth, Eighth and Fourteenth Amendments.

### B.     Petitioner's Waiver of His Rights Was Not Knowing, Intelligent or Voluntary.

142.  Petitioner's waiver of his Miranda[16] rights was not knowing, intelligent or voluntary because, as a result of Petitioner's cognitive deficits, Petitioner could not understand those rights.  Counsel's failure to have Petitioner evaluated, conduct the

---

[16]Miranda v. Arizona, 384 U.S. 436 (1966).

required pretrial investigation and development of evidence demonstrating Petitioner's deficits, and counsel's failure to raise and litigate the claims arising out of the invalidity of Petitioner's waiver constitutes ineffective assistance of counsel.

143.   As Petitioner will demonstrate at an evidentiary hearing, Petitioner suffers from cognitive impairments that render him incapable of adequately comprehending or appreciating the Miranda warning or the consequences of waiving his constitutional rights.  As Petitioner will demonstrate, Petitioner's IQ scores fall within the mental retardation range.  In addition, Petitioner suffers – and suffered at the time of his arrest and interrogation – from brain dysfunction that impacts his judgment and impulse control.  Each of these impairments rendered Petitioner incapable of making a knowing, intelligent determination of whether or not to waive his constitutional rights during the police interrogation.

144.   Petitioner's cognitive functioning, academic functioning, and judgment are all at a level far below that required to comprehend and appreciate the Miranda rights.

145.   Dr. George Baroff, Ph.D., conducted a study to determine the complexity of the Miranda warnings and concluded that the "Miranda warning is typically at a seventh-grade level of difficulty." 22-AUG Champion 33, at 3.   As he will demonstrate at an evidentiary hearing, Petitioner's capabilities fall far below that

66

level.

146.   Dr. Baroff has concluded that "[b]ecause of the complex language pertaining to the right of an attorney, [a defendant with intellectual and cognitive impairments like Petitioner's] rarely understands that assistance from a lawyer is available during interrogation.  Nor does he understand that if he chooses to answer questions without a lawyer present, he can discontinue at any time and ask for one." Id.

147.   A recent study published in the University of Chicago Law Review reveals that those with impairments like Petitioner's do not understand the Miranda warnings:

> Virtually all of the disabled subjects failed to understand the context in which interrogation occurs, the legal consequences embedded in the rules or the significance of confessing, the meaning of the sentences that comprise the warnings, or even the individual operative words used to construct the warnings. In contrast, comparably large percentages of the nondisabled control group did understand the individual words, the complete warnings, and their legal significance.

69 U. Chi. L. Rev. 495, 501, Words Without Meaning:  The Constitution, Confessions, And Mentally Retarded Suspects.

148.   Indeed, Miranda is premised upon the assumption that the suspects who are provided the warning will understand the meaning of the warnings and its legal significance:   "Unless a suspect understands the warning, they are but meaningless

67

sounds." <u>Id.</u> at 499.  In this case, the Miranda warnings given to Petitioner were but "meaningless sounds."

149.    The empirical data confirms that for those with cognitive impairments like Petitioner's "the Miranda warnings cannot serve the instrumental functions for which they are intended – ensuring that confessions are the product of knowing, intelligent, and voluntary waivers of the right to remain silent, and not the result of the pressures inherent in custodial interrogations." <u>Id.</u> at 500.

150.    The data indicates that the Miranda warnings are "[i]ncomprehensible to people whose mental retardation is classified as mild, as well as some people whose intelligent quotient (IQ) scores exceed 70..." <u>Id.</u> at 501.  The study goes on to state that:

> The results of this empirical analysis indicate that the factor that matters is the presence of retardation, even mild retardation.  Multiple regression analysis demonstrates that variations in age, education, and experience with the criminal justice system or the Miranda warnings do not compensate for a mentally retarded person's inability to comprehend the warnings.  If mental retardation is present, then the disabled person will not understand the warnings, regardless of the presence of the other factors.

> *    *    *    *

> These data indicate that waivers of the Miranda "rights" by this population are not "knowing" or "intelligent" in any meaningful sense of those words.  Neither the primary device used during custodial interrogations – the Miranda warnings – nor the traditional "totalities"

68

analysis is an adequate device for enforcing the constitutional rights of
this population. The results of this study suggest that the words
"knowing and intelligent" have no useful meaning as our courts apply
them to waivers of Miranda "rights" by mentally retarded suspects.

Id. at 502.

151. The data demonstrates that individuals with Petitioner's cognitive and

intellectual deficits simply do not understand the Miranda warnings:

The general results achieved by the retarded subjects on the Warnings
Test for each of the four sentences of the Miranda warnings indicate
they do not understand any of these sentences. Their misunderstanding
was most obvious for the sentences announcing the right to remain
silent, the right to a free appointed attorney, and the fact that their
statements might be used against them.

Id. at 544. Indeed, this study further concluded that "[e]ven people with only the

mildest retardation do not understand the Miranda warnings or their legal

significance." Id. at 531.

152. Equally as disturbing, the study demonstrates that "the disabled's

condition leads them to believe mistakenly that they understand the world's workings

and their rights within it . . . They have strong beliefs that are wrong. The disabled

appear to choose the wrong answer with confidence." Id. at 543-44.

153. Trial counsel did not have Petitioner evaluated by a mental health

professional and did not have any testing conducted on Petitioner to assess his

intellectual capacity. Thus, counsel did not discover Petitioner's cognitive and

69

intellectual deficits. Counsel's failure to investigate and develop evidence demonstrating that Petitioner's waiver of his rights was not knowing, intelligent or voluntary constitutes deficient performance. Counsel can have no reasonable strategic reason for failing to develop evidence that would have required the suppression of Petitioner's statement. Moreover, as the prosecution relied on that statement as a key part of its case against Petitioner at trial, prejudice is demonstrated and relief is required under the Sixth, Eighth and Fourteenth Amendments.

154. Direct appeal counsel was precluded from raising the above-described claims of ineffective assistance of counsel on direct appeal. See Commonwealth v. Grant, 813 A.2d 726 (Pa. 2002). In the alternative, appellate counsel's failure to raise on direct appeal the issue of trial counsel's ineffectiveness for failure to investigate Petitioner's cognitive and intellectual deficits and challenge the voluntariness of Petitioner's statement to police and its subsequent admission to the jury constitutes ineffective assistance of counsel. Under Wiggins v. Smith, 123 S. Ct. 2527(2003), Williams v. Taylor, 529 U.S. 362 (2000), and Strickland v. Washington, 466 U.S. 668 (1984), trial counsel's failure to conduct a constitutionally adequate investigation into the readily available evidence of Petitioner's cognitive and intellectual deficits and the impact of these deficits on his ability to comprehend the nature of the rights he was waiving, as detailed above, is an issue of arguable merit that appellate counsel

70

had an obligation to investigate and present to the Pennsylvania Supreme Court on direct appeal. As there is a reasonable likelihood that a proper development and presentation of the above-described evidence would have resulted in suppression of the statement, prejudice is demonstrated and relief is required.

### C. The Prosecution's Failure to Disclose and Counsel's Failure to Obtain the Tape of the Interrogation of Petitioner Violated Petitioner's Sixth, Eighth and Fourteenth Amendment Rights.

155. Petitioner was extradited on September 12, 2002 and he was arraigned in York County on that date. Nevertheless, the police interrogated Petitioner on September 27, 2002, resulting in the taped statement. As noted above, the prosecution elicited nothing more than Detective Comacho's summary of Petitioner's interrogation on August 7, 2002. The interrogation on September 27, 2002, was, however, taped. Despite the Commonwealth's obligation under the Rules of Criminal Procedure (see Pa. R. Crim. Proc. 573(B)(1)(b)), the prosecution failed to turn over this tape to the defense. Indeed, trial counsel was not aware that a tape existed. In addition, the Due Process Clause of the Fourteenth Amendment to the United States Constitution requires a prosecutor to disclose favorable evidence to the accused that is material to either guilt or punishment. Brady v. Maryland, 373 U.S. 83, 87 (1963). Petitioner avers that the tape of the interrogation contains evidence supporting his innocence and contradicting the prosecution's trial theory. Thus, the Commonwealth

71

was obliged to disclose the existence of the tape and turn over the tape or a copy of that tape to the defense prior to trial and the failure to do so violated Petitioner's Sixth, Eighth and Fourteenth Amendment Rights.

156.   To the extent counsel knew or should have known that the police taped Petitioner's interrogation, counsel's failure to request and obtain a copy of that tape constitutes ineffective assistance of counsel.   Counsel can have no reasonable strategic basis for failing to obtain evidence that would have supported Petitioner's innocence, contradicted the police version of Petitioner's statement and provided corroboration for Petitioner's defense at trial.   As the prosecution relied on the police version of Petitioner's interrogation, the failure to obtain the tape resulted in prejudice in violation of Petitioner's Sixth, Eighth and Fourteenth Amendment rights. For each of the reasons, Petitioner is entitled to relief.

## CLAIM VI.   PETITIONER IS ENTITLED TO RELIEF BECAUSE ONE JUROR'S CRIMINAL RECORD RENDERED HIM STATUTORILY INELIGIBLE TO SERVE ON A JURY IN VIOLATION OF 42 PA. C.S. § 4502, PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.

157.   The matters set forth in all other sections of this *Petition* are repeated and realleged as if set forth entirely herein.

158.   Individuals who have been "convicted of a crime punishable by imprisonment for more than one year" are ineligible to serve on juries in

72

Pennsylvania.  42 Pa. C.S. § 4502(a)(3).

159.    Upon information and belief, Petitioner avers that Juror Number 55 had a conviction (arising from a guilty plea) that rendered him ineligible for jury service. York County Court records indicate that an individual – matching the biographical information of this juror – entered a guilty plea to simple assault before the York County Court of Common Pleas on September 10, 1997, and was  sentenced to twenty-three months probation.  See No. 2374 C.A. 1997; 2375 C.A. 1997  (Order, September 10, 1997).[17]  Simple assault is a misdemeanor of the second degree that carries a maximum penalty of two years imprisonment.  Accordingly, Juror Number 55 was statutorily ineligible to serve as a juror.

160.    By seating an individual who was legally ineligible to serve, the Commonwealth deprived Petitioner of his right to a fair and impartial jury under the Sixth, Eighth and Fourteenth Amendments.

161.    Under Pennsylvania law, as Petitioner's jury was constitutionally tainted, a new trial is required, regardless of the presence or absence of prejudice.  See e.g., Commonwealth v. Kelly, 609 A.2d 175, 177 (Pa. Super. 1992) (concluding that,

---

[17]Petitioner's counsel does not have the jury questionnaires.  However, a comparison of the voir dire proceedings and the contents of these court records reflects similar biographical information.  Of course, obtaining the jury questionnaire for Juror Number 55 would assist counsel in obtaining further verification.

because the seating of a juror with an excludable criminal conviction rendered that juror statutorily ineligible to sit on a jury, proof of prejudice is not required).

162.   Petitioner further avers that the questionnaire form that this juror completed for the jury selection process in this case contains material facts that support this claim.[18]   Petitioner's counsel does not have access to this questionnaire as they are not part of the Clerk of Court file.   As this is a capital case, counsel presumes that the court preserved these forms.   In light of these averments, and the need for heightened reliability in capital cases, Petitioner respectfully requests that this Court order the Court of Common Pleas to provide counsel with a copy of the questionnaire so that counsel can conduct further investigation and development of this claim

163.   Trial counsel's failure to object to the seating of an ineligible juror in violation of Petitioner's federal constitutional rights constitutes ineffective assistance of counsel under state and federal law.   As noted above, this claim is of arguable merit.  Counsel can have no strategic reason for failing to ensure that Petitioner's jury meets the statutory and constitutional requirements.   Prejudice is demonstrated

---

[18]There is no indication that Juror Number 55 disclosed his prior conviction during voir dire.  See NT Vol. I at 204-11.  Petitioner further avers upon information and belief that this juror failed to disclose the prior conviction on his juror questionnaire. Counsel does not have access to the completed jury questionnaires as they are not part of the court record.

because as a result of counsel's deficient performance, an ineligible individual was permitted to sit on Petitioner's jury in violation of Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

164.   Direct appeal counsel was precluded from raising the above-described claims of ineffective assistance of counsel on direct appeal. See Commonwealth v. Grant, 813 A.2d 726 (Pa. 2002). To the extent that counsel should have and could have raised the above-described claims on direct appeal under controlling precedent and procedure, counsel's failure to do so constitutes ineffective assistance of counsel in violation of the Sixth, Eighth, and Fourteenth Amendments. As this claim requires grant of a new trial, counsel could have no strategic reason for failing to raise these issues on direct appeal. As the seating of this ineligible juror resulted in an invalid jury, prejudice is demonstrated because there is more than a reasonable likelihood that had counsel raised this claim on appeal, relief would have been granted. For each of the reasons, Petitioner is entitled to relief.

**CLAIM VII. THE USE OF A STUN BELT DURING PETITIONER'S JURY SELECTION AND TRIAL VIOLATED PETITIONER'S RIGHTS TO DUE PROCESS, A FAIR TRIAL, AND PRESUMPTION OF INNOCENCE, IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

165.   The matters set forth in all other sections of this *Petition* are repeated and realleged as if set forth entirely herein.

166.   The trial court improperly sanctioned the use of a stun belt on Petitioner's ankle during Petitioner's capital trial.  The use of the stun belt was not reasonably necessary, violated Petitioner's presumption of innocence by telegraphing to the jury that he was incarcerated and dangerous; had a chilling effect on Petitioner's communications with counsel; and the threat of the stun belt affected his demeanor during jury selection, trial and sentencing, including when he testified.[19]  The court's error in requiring Petitioner to wear a stun belt, and trial counsel's failure to object to its use violated Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights.

**A.    Petitioner's Rights to Due Process and the Presumption of Innocence Were Violated.**

167.   Due process has long required that the jury's verdict must be based on the evidence developed at trial as opposed to information from outside resources.

---

[19]It appears that at least some members of Petitioner's jury may have witnessed the stun belt on Petitioner's ankle, as is indicated by the following admonishment by the Court to Petitioner:

The Court (through intepreter): "Mr. Montalvo, you're equipped with a stun belt from your ankle, if you pull your pants up to expose that to the jury that's your problem. I'm not going to tell you again to keep it covered. If you pull it up and it prejudices the jury, that's an issue you have to deal with.  It will not result in a mistrial and I will not be discharging this jury if you do that, do you understand that? If you want to show the jury you have a stun belt around your leg that's your decision."  NT Vol. I at 1.  There is no indication on the record as to why Mr. Montalvo was required to wear a stun belt in the first place.

Chandler v. Florida, 449 U.S. 560, 575 (1981).  More importantly, "the presumption of innocence . . .  is a basic component of a fair trial under our system of criminal justice."  Estelle v. Williams, 425 U.S. 501, 503 (1976).  Over a hundred years ago, the Supreme Court declared that:

> The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law.

Coffin v. United States, 156 U.S. 432, 453 (1895).  For these reasons, "courts must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt."   Estelle, 425 U.S. at 503.  Requiring a defendant to wear a stun belt that can be seen by the jury creates an unreasonable risk of diluting the presumption of innocence and, therefore, deprives an accused of his Fourteenth Amendment rights.  See Estelle, 425 U.S. at 504-05. (requiring defendant to appear before jury in prison attire unconstitutionally infringes due process right to presumption of innocence); See also Gaito v. Brierly, 485 F.2d 86, 88 (3d Cir. 1973) (same).  By forcing Petitioner to wear a stun belt on his ankle, that was plainly in sight of the jury at various points of the jury selection and trial, the trial court violated these fundamental tenets of federal constitutional law and Petitioner's federal constitutional rights.

**B.    The Use of the Stun Belt Violated Petitioner's Right to Counsel and to Participate in His Own Defense.**

168.    In addition to violating Petitioner's right to the presumption of innocence, the use of the belt also violated his due process right to counsel and to participate in his own defense.  The belt was remotely operated and designed to disorient, immobilize and stun Petitioner.  It can be activated by the sheriffs unilaterally, without authorization from the judge.  When activated, the belt can deliver up to 50,000-volts, a shock lasting up to eights seconds. It causes incapacitation in the first few seconds and severe pain during the entire period. Its use can cause involuntary defecation and urination, immobilization and may cause the victim to fall to the ground. Effects can last up to 45 minutes and can leave welts requiring months to heal.  See Shelley Dahlberg, *Comment, The React Security Belt: Stunning Prisoners and Human Rights Groups into Questioning Whether Its Use Is Permissible Under the U.S. and Texas Constitutions*, 30 St. Mary's L.J. 239, 251-52 (1998).  Nor were there written rules on when the belt could be activated.  In this case there was no showing that the use or threat of a stun belt was necessary under the facts.  Petitioner had not been unruly, disruptive or threatening.  The threat of use of a stun belt is a psychological deterrent that impedes a defendant's participation in his own defense and violated due process and the right to counsel.  Hawkins v.

78

Comparet-Cassani, 251 F.3d 1230, 1240 (9th Cir. 2001) (no per se bar to use of stun belt but should be limited to legitimate security rationale); People v. Melanson, 937 P.2d 826, 836 (Colo.App.1997) (recognizing defendant's fear of the belt could prevent him from "participat[ing] fully and meaningfully in his trial").

169.   Petitioner's right to a fair trial and due process were violated as a result of the forced use of this stun belt.  Counsel's failure to protect Petitioner's rights and object to the use of the stun belt constituted ineffective assistance of counsel. Petitioner was prejudiced, and relief is required.

170.   Direct appeal counsel was precluded from raising the above-described claims of ineffective assistance of counsel on direct appeal.  See Commonwealth v. Grant, 813 A.2d 726 (Pa. 2002).  To the extent that counsel could have and should have raised the above-described errors on direct appeal under controlling precedent and procedure, counsel's failure to do so constitutes ineffective assistance of counsel in violation of the Sixth, Eighth and Fourteenth Amendments.   Accordingly, for this reason as well, relief is required.

79

**CLAIM VIII.** **THE SELECTION OF A DEATH-QUALIFIED JURY WHERE PETITIONER IS INNOCENT OF DEATH AND MILTON MONTALVO'S JURY VERDICT PRECLUDED THE COMMONWEALTH FROM SEEKING DEATH VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.**

171.   The claims and factual allegations set forth in all other sections of this *Petition* are incorporated by reference and realleged as if set forth entirely herein.

172.   As noted above, prior to Petitioner's arrest and trial, the Milton Montalvo jury found that it was Milton Montalvo who actually committed both murders.  The jury's factual determination arises from its guilt-phase and penalty-phase verdict in Milton Montalvo's case.

173.   The jury found Milton Montalvo guilty of first degree murder as to both victims.   In reaching its sentencing determination, the jury found that the Commonwealth met its burden of proof as to the 42 Pa. C.S. § 9711(d)(6) aggravator for both victims.  The only way that the jury could have reached these determinations was if the jury also found that it was Milton Montalvo, not someone else, who actually committed each of the murders.  Commonwealth v. Lassiter, 722 A.2d 657, 662 (Pa. 1998) ("we conclude that, as used in the statute at issue, [42 Pa. C.S. § 9711(d)(6)] the word "commit" requires a defendant to have performed the murder herself"); id. (The "plain meaning of the statute itself" establishes that "Section

9711(d)(6) may not be applied to an accomplice who does not 'commit' the killing in the sense of bringing it to completion or finishing it."). Similarly, the jury also concluded that the Commonwealth met its burden as to the 42 Pa. C.S. § 9711 (d) (11) aggravating factor (requiring that the Commonwealth prove that the defendant "has been convicted of a murder in any jurisdiction and committed either before or at the time of the offense at issue").

174.   The Milton Montalvo jury's determination that it was Milton Montalvo who actually committed the murders rendered Petitioner legally innocent of the death penalty and the prosecution was collaterally, legally and constitutionally estopped from pursuing a capital prosecution against Petitioner.[20]

175.   Nonetheless, the prosecution sought death on the basis of the same aggravating factors that the jury found applicable to Milton Montalvo and, therefore, were legally and constitutionally inapplicable to Petitioner and, as a result, the prosecution was able to obtain a death-qualified jury. As Petitioner was legally ineligible for the death penalty because the aggravating factors were not applicable based on the Milton Montalvo jury verdict, the selection of a death-qualified jury violated Petitioner's Sixth, Eighth and Fourteenth Amendments rights.

---

[20]As described more fully above, see Claim II, the prosecution's election to pursue diametrically opposed theories in each trial violated Petitioner's state and federal constitutional rights.

176.   Counsel's failure to raise and litigate the constitutional bar against the capital prosecution and the corresponding bar against the selection of a death-qualified jury arising from the Milton Montalvo jury's verdict constitutes ineffective assistance of counsel in violation of the Sixth, Eighth and Fourteenth Amendments. The adequacy of counsel's performance is "measured against an 'objective standard of reasonableness,' [Strickland v. Washington, 466 U.S. 668, 688 (1984)], 'under prevailing professional norms.' *Ibid.*; Wiggins v. Smith, [539 U.S. 510, 521 (2003)]." Rompilla v. Beard, 545 U.S. 374, 380 (2005).

177.   Here, counsel failed to raise and litigate constitutional bases for precluding the capital prosecution and the selection of a death-qualified jury. Counsel's performance was deficient.  Likewise, as described above, the failure to raise these claims pretrial, post-trial and on direct appeal is of arguable merit and counsel could have no reasonable strategic basis for failing to raise proper legal bases precluding Petitioner's capital prosecution.  Prejudice is demonstrated because there is a reasonable likelihood that had counsel raised and litigated these claims, the capital prosecution against Petitioner would have been precluded and the jury would not have been death-qualified.  Petitioner is entitled to relief.

**CLAIM IX.   AS A RESULT OF COURT ERROR AND INEFFECTIVE ASSISTANCE OF COUNSEL, PETITIONER WAS DENIED A FAIR AND IMPARTIAL JURY IN VIOLATION OF HIS SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.**

178.    The matters set forth in all other sections of this *Petition* are repeated and realleged as if set forth entirely herein.

**A.    The Legal Standard.**

179.    It is well settled that the Sixth and Fourteenth Amendments "guarantee a defendant on trial for his life the right to an impartial jury." Ross v. Oklahoma, 487 U.S. 81, 85 (1988); Irvin v. Dowd, 366 U.S. 717, 722 (1961). Part of the guaranty of this right "is an adequate voir dire to identify unqualified jurors." Morgan v. Illinois, 504 U.S. 719, 730 (1992); Dennis v. United States, 339 U.S. 162, 171-172 (1950); Morford v. United States, 339 U.S. 258, 259 (1950).   It is also well settled that the Sixth Amendment right to an impartial jury is violated when a jury is empaneled that is "uncommonly willing to condemn a man to die." Witherspoon v. Illinois, 391 U.S. 510, 521 (1968).

180.    Moreover, the requirement of adequate voir dire takes on even greater importance in a capital case, because of the "the qualitative difference of death from all other punishments," California v. Ramos, 463 U.S. 992, 998-99 (1983), and because capital juries are required to make a "highly subjective 'unique

individualized judgment regarding the punishment that a particular person deserves,'" Caldwell v. Mississippi, 472 U.S. 320, 340-41 n.7 (1985). Because of the heightened protections due capital defendants and the "unique opportunity [which] exists for bias to operate undetected" at capital sentencing, King v. Lynaugh, 828 F.2d 257, 259 (5th Cir. 1987), adequate voir dire of potential jurors becomes even more important.

181.   The constitutional standard for determining juror bias is no different in a capital case than it is in any other case.   Wainwright v. Witt, 469 U.S. 412, 423 (1984) ("there is nothing talismanic about juror exclusion" in capital cases).   Under the Sixth Amendment, a juror is considered biased if "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"   Gray v. Mississippi, 481 U.S. 648, 657 (1987) (quoting Adams v. Texas, 448 U.S. 38, 45 (1980)).

182.   In Witt, the United States Supreme Court stated, "As with any other trial situation where an adversary wishes to exclude a juror because of bias, . . . the adversary seeking exclusion . . . must demonstrate, through questioning, that the potential juror lacks impartiality."   Then the trial judge  "determine[s] whether the challenge is proper."   Witt, 469 U.S. at 423-24; id. at 429 ("excluding prospective capital sentencing jurors because of their opposition to capital punishment is no different from excluding jurors for innumerable other reasons which result in bias").

183.   In determining a juror's fitness to serve on a capital jury, the Supreme Court has ruled that "the State may bar from jury service those whose beliefs about capital punishment would lead them to *ignore the law or violate their oaths*." Adams v. Texas, 448 U.S. 38, 51 (1980). See Gray v. Mississippi, 481 U.S. 648, 657 (1987); Morgan v. Illinois, 504 U.S. 719, 728 (1992). The right to an impartial jury entitles a capital defendant to a sentencing jury that is capable of following the law and imposing a life sentence, no less than the state is entitled to a jury that is capable of following the law and imposing a death sentence. See Stroud v. United States, 251 U.S. 15 (1919); Ross v. Oklahoma, 487 U.S. 81 (1988); Morgan v. Illinois, 504 U.S. at 728-29 (reiterating Ross). Thus, the applicable standard is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" See Morgan, 504 U.S. at 728 (quoting Wainwright v. Witt, 469 U.S. at 424, and Adams v. Texas, 448 U.S. at 45). Where even a single juror harbors a prejudice against the defendant or in favor of the prosecution, the impartiality of the entire jury is compromised. Ross v. Oklahoma, 487 U.S. at 85; Turner v. Murray, 476 U.S. 28 (1986); Ristaino v. Ross, 424 U.S. 589, 596 (1976); Irvin v. Dowd, 366 U.S. at 722; United States v. Evans, 917 F.2d 800, 809 (4th Cir. 1990). Where the court's voir dire fails to adequately inquire into these potential biases, the Sixth, Eighth and Fourteenth Amendments are violated.

85

**B.    As a Result of Ineffective Assistance of Counsel and Trial Court Error, the Voir Dire Was Inadequate To Protect Petitioner's Right to A Fair Trial and a Fair and Impartial Jury in Violation of Petitioner's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments.**

184.   Our system of justice recognizes that individuals can harbor specific beliefs yet still be able to fairly consider the evidence presented and apply the law as instructed by the court.  It is not the belief which renders the juror incapable of serving.  The question is rather whether that belief would substantially impair the juror's ability to be fair.  Where an individual can set that belief aside and apply the law to the facts, exclusion is improper.  For this reason, counsel's inquiry when a prospective juror expresses reservations about or beliefs against the death penalty is critical to a defendant's right to a fair and impartial jury.

185.   In capital cases, "a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause." Uttecht v. Brown, 551 U.S. 1, 9 (2007). A prospective capital juror is "partial" and should be struck for cause if his or her views on capital punishment "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Adams v. Texas, 448 U.S. at 45; Witt, 469 U.S. at 424.  Effective counsel know that adequate voir dire is the only way to identify and strike such potential jurors, and, conversely,

86