ensure that venire persons who are able to perform their duties as jurors are not improperly removed for cause.

186.    The responsibility lies with the trial court to determine whether a challenge for cause is proper.  "Thus, before it can sustain the exclusion, the judge must make a factual determination that the prospective juror would be biased." Szuchon v. Lehman, 273 F.3d 299, 328 (3d. Cir. 2001).

187.    Life-qualification refers to instances of excluding jurors who are partial to the state because their pro-death penalty views prevent or substantially impair them from returning a life sentence.  Death qualification refers to instances when the state seeks to exclude jurors who are partial to the defense because their anti-death penalty views would prevent or substantially impair them from returning a death sentence. Where the court's voir dire fails to adequately inquire into these potential biases, the Sixth, Eighth and Fourteenth Amendments are violated.

188.    A new sentencing proceeding is required whenever the court improperly dismisses jurors who expressed doubt or opposition to the death penalty or questioned the death penalty.  These actions violate Witherspoon v. Illinois, 391 U.S. at 521; see Szuchon v. Lehman, 273 F.3d 299 (3d Cir. 2001) (reversing death sentence because exclusion for cause of prospective juror who stated that he did not believe in death penalty, but was not asked whether he could be impartial, warranted grant of habeas

relief).

189.    The use of voir dire to eliminate potential jurors should be even handed, treating fairly both the defendant and the prosecution.  Under Witherspoon and its progeny, the prosecution may challenge for cause any potential juror whose anti-capital punishment views would "prevent or substantially impair" him or her from voting for a death sentence in an appropriate case.

190.    In this case, Petitioner's death sentence must be vacated because the trial court failed to properly "life-qualify" three venire persons who were ultimately seated on Petitioner's jury, while at the same time improperly striking for cause two jurors who were not "substantially impaired" by their views on the death penalty.  The failure to properly life and death qualify these jurors violated Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

### 1.      Failure to Life-Qualify the Jury

191.    The defense has a constitutional right to challenge for cause any potential juror whose pro-capital punishment views would "prevent or substantially impair" him or her from voting for a life sentence in an appropriate case.  See Morgan v. Illinois; Ross v. Oklahoma, Witherspoon; Stroud v. United States, 251 U.S. 380 (1920).  In Stroud, the Supreme Court ruled that a juror who cannot vote for life is partial and should not serve, and found that the defendant should have been

allowed to strike a potential juror for cause when his voir dire testimony suggested that "in the event of conviction for murder in the first degree he would render no verdict other than one which required capital punishment." Id., 251 U.S. at 381.

192.   In Witherspoon, the Supreme Court reiterated that permitting "a juror who felt it his 'duty' to sentence every convicted murderer to death ... to serve ... 'while those who admitted to scruples against capital punishment were dismissed without further interrogation'" was a "'double standard' [that] 'inevitably resulted in [the] denial of due process.'" Id., 391 U.S. at 522 n.20 (quoting Crawford v. Bounds, 395 F.2d 297, 303-04 (4th Cir. 1968), and citing Stroud).

193.   In Ross, the Supreme Court reiterated the "well settled" law that "the right to an impartial jury" requires exclusion for cause of potential jurors who would automatically vote for death. 487 U.S. at 85 (citing Witt; Adams; Irvin); see also id. at 92 (Marshall, J., joined by Brennan, Blackmun & Stevens, JJ., dissenting) (agreeing with majority on this point).  See also Morgan, 504 U.S. at 729 ("A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do").  Moreover,

> "[P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors.  Dennis v. United States, 339 U.S. 162, 171-172 (1950); Morford v. United States, 339

U.S. 258, 259 (1950). "Voir dire plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored. Without an adequate voir dire the **trial judge's responsibility** to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981) (plurality opinion).

Morgan v. Illinois, 504 U.S. 719, 729-730 (1992).

194.   In Morgan and in Rosales-Lopez, the Supreme Court explicitly stated that the responsibility to identify and remove prospective jurors who will not be impartial lies with the trial court.

195.   Finally, "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." California v. Ramos, 463 U.S. 992, 998-99 (1983). Capital juries are required to make a "highly subjective 'unique individualized judgment regarding the punishment that a particular person deserves'." Caldwell v. Mississippi, 472 U.S. 320, 340-341, n.7 (1985). Where a juror's bias is of the nature that it precludes him or her from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death the resulting verdict violated the Eighth and Fourteenth Amendments. Lockett v. Ohio, 438 U.S. 586, 604 (1978).

196.    While the court asked death-qualification of every juror on the panel to ensure each venire person's ability to render a sentence of death if appropriate, the court failed to consistently make the same inquiry of each and every juror on the issue of life-qualification, i.e., whether the juror would automatically vote for death.  As a result of the court's failure to conduct this inquiry of every member of the panel, and trial counsel's concomitant failure to either request the court make the constitutionally required inquiry or ask the appropriate life-qualification questions himself, Petitioner's jury consisted of three jurors who were never life-qualified.[21]

## 2.    Improper Excusals of Death-Qualified Venirepersons

197.    In response to a general question by the court about her thoughts and feelings on the death penalty, and whether she had any "moral, religious, ethical or conscious scruples" that would prevent her from imposing the death penalty, prospective juror Pamela Landes stated that "I don't think I would be able to do that." The court then asked the following follow up question:

> If I would tell you what the law is concerning the factors that a jury must find before the death penalty could be imposed, if those factors were in fact proven by the Commonwealth beyond a reasonable doubt and if the evidence and the instruction to you warranted a finding of the death penalty, are you telling me that you would not be able to impose the

---

[21]See NT Vol. I at 44-52 (Venire Number 207, Katrina Smeltzer); id. at 109-15 (Venire Number 122, Joseph Kushnerick); id. at 143-48 (Venire Number 228, Gary Tilton).

death penalty?

NT Vol. I at 54.  Ms. Landes responded, "I couldn't do that, no."  The prosecution immediately moved to strike Ms. Landes for cause, and, rather than attempt to rehabilitate the prospective juror to determine whether her beliefs would, in fact, substantially impair her ability to follow the court's instructions and the law, defense counsel stated that he had no objection to the prosecution's motion.  Id.

198.   A similarly limited and flawed voir dire exchange occurred with prospective juror Donna Smith.  When asked whether she had any moral, religious, or ethical scruples that would prevent her from imposing a death penalty, Ms. Smith merely replied yes.  The court asked one follow up question, whether Ms. Smith would be able to impose death despite what the evidence and law told her to do, to which Ms. Smith responded, "That is correct."  NT Vol. I at 177.  Again, no further questions were asked of Ms. Smith by the court, the prosecution, or defense counsel.  The juror was never asked whether her views on the death penalty would "substantially impair" her ability to follow the court's instructions or the law.

199.   The court's exclusion of these prospective jurors without conducting a full inquiry into whether or not their beliefs would have substantially impaired their ability to follow the law as instructed by the court, violated Petitioner's Sixth, Eighth and Fourteenth Amendment rights.  Relief is required.

92

### C.    Counsel was Ineffective.

200.    With regard to the improper excusals for cause of the two venire persons who expressed a concern about the death penalty but were not substantially impaired in their ability to follow the law, counsel's failure to request additional voir dire and attempt to rehabilitate these jurors was objectively unreasonable and prejudiced Petitioner, in violation of the Sixth Amendment right to effective assistance of counsel. See Wiggins, Williams, and Strickland, 466 U.S. at 694. The American Bar Association's Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (Rev. Ed. 2003), the "prevailing professional norms" in effect at the time of Petitioner's trial in 2003, mandate that counsel in death penalty cases "develop a strategy for rehabilitating those prospective jurors who have indicated opposition to the death penalty."    ABA GUIDELINES FOR APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES (Rev. Ed. 2003), ABA Guideline 10.10.2, Commentary, at 106.    In addition to comporting with the "prevailing professional norms," effective counsel is also charged with being aware of  "the state of the applicable law." Everett v. Beard, 290 F.3d 500, 509 (3d Cir. 2002).  At the time of jury selection (March, 2003), the United States Supreme Court had long recognized a capital defendant's constitutional right to a properly death-qualified and life-qualified jury. See Morgan, Wainwright, Witt.  There is no possible

93

strategic reason for failing to object to the prosecution's challenges for cause or to request follow up questions to rehabilitate these jurors.

201.   As these issues involve Petitioner's fundamental right to an impartial jury, counsel could have no sound trial strategy to support their waiver of this constitutional right.  See Hughes v. United States, 258 F.3d 453, 463 (6th Cir. 2001). As demonstrated above, the failure of both the Court to conduct a constitutionally adequate voir dire, and counsel's subsequent failure to make appropriate challenges for cause, request additional voir dire, and/or to object to the prosecution's challenges for cause, resulted in the empaneling of three jurors who were never properly life-qualified and the improper excusal for cause of two venire persons, demonstrates prejudice.  Relief is required.

## D.    Appellate Counsel's Ineffectiveness.

202.   Direct appeal counsel was precluded from raising the above-described claims of trial counsel's ineffective assistance of counsel on direct appeal.  See Commonwealth v. Grant, 813 A.2d 726 (Pa. 2002).  To the extent that counsel should have and could have raised the above-described claims on direct appeal under controlling precedent and procedure, counsel's failure to do so constitutes ineffective assistance of counsel in violation of the Sixth, Eighth, and Fourteenth Amendments.

203.   Counsel's failure to raise these claims on appeal constitutes prejudicially deficient performance. The same standards apply to claims of appellate ineffectiveness. See, e.g. Roe v. Flores-Ortega, 528 U.S. 470 (2000) (applying Strickland standard to consideration of appellate counsel's ineffectiveness); United States v. Mannino, 212 F.3d 835 (3d Cir. 2000); Orazio v. Dugger, 876 F.2d 1508, 1513 (11th Cir. 1989); Matire v. Wainwright, 811 F.2d 1430, 1435 (11th Cir. 1987). Where, as in this case, there is a "reasonable probability that the neglected claim[s] would have succeeded on appeal, [] counsel's failure to raise the claim f[alls] outside the range of reasonably competent assistance." Claudio v. Scully, 982 F.2d 798, 799 (2d Cir. 1992); Jackson v. Leonardo, 162 F3d. 81, 85 (2d Cir. 1998) (appellate counsel's failure to raise "sure winner" constituted ineffective assistance: "In the instant case, we believe that appellate counsel's failure to raise a well-established, straightforward, and obvious . . . [claim] . . . constitutes ineffective performance."); Freeman v. Lane, 962 F.2d 1252, 1258-59 (7th Cir. 1992) (appellate counsel ineffective for failing to raise a meritorious claim that was "presented squarely" at trial regarding a violation of the defendant's Fifth Amendment rights); Murphy v. Puckett, 893 F.2d 94, 96-97 (5th Cir. 1990) (counsel's failure to raise valid defense at trial and on direct appeal constituted ineffective assistance). Accordingly, for this reason as well, relief is required.

95

204.   Appellate counsel – who is presumed to know the law – was independently ineffective under the Fourteenth Amendment for failing to raise these issues.  It has long been the standard of care in capital cases that appellate "counsel should seek to litigate all issues, whether or not previously presented, that are arguably meritorious."   AMERICAN BAR ASSOCIATION GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN CAPITAL CASES, Guideline 10.15.1.(C), *Duties of Post-Conviction Counsel*[22] (2003 rev. ed.); id. *Comment, Direct Appeal* ("[I]t is of critical importance that counsel on direct appeal proceed . . . in a manner that maximizes the client's ultimate chances of success. . . When a client will be killed if the case is lost, counsel should not let any possible ground for relief go unexplored or unexploited."); AMERICAN BAR ASSOCIATION GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN CAPITAL CASES, Guideline 11.9.2.(D), *Duties of Appellate Counsel* (1989 ed.) ("Appellate counsel should seek, when perfecting an appeal, to present all arguably meritorious issues"); id. *Commentary* ("Traditional theories of appellate practice notwithstanding, appellate counsel in a capital case should not raise only the best of several potential issues. . . . When a client will be killed if the case is lost, counsel

---

[22]The 2003 Guidelines include direct appeal counsel under the discussion of post-conviction counsel, which applies to all counsel who enter a case after the time of conviction.

(and the courts) should not let any possible ground for relief go unexplored or unexploited.").  As a result, counsel in a capital case can have no reasonable basis for failing to present a meritorious issue on direct appeal.  Relief is required.

**CLAIM X.    PETITIONER WAS DENIED A FAIR AND IMPARTIAL JURY IN VIOLATION OF HIS SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS BECAUSE THE YORK COUNTY JURY SELECTION PROCEDURE SYSTEMATICALLY EXCLUDED MINORITIES.**

205.    The matters set forth in all other sections of this *Petition* are repeated and realleged as if set forth entirely herein.

206.    Petitioner, a Hispanic man, was denied a jury pool representing a fair cross section of his community and a chance of a fair and impartial jury of his peers in violation of his rights under the Sixth, Eighth and Fourteenth Amendments.

207.    The venire panel for Petitioner's capital trial included sixty people. Petitioner has determined there were no Latino persons or persons of color on Petitioner's panel despite the fact that approximately three percent (3 %) of York County and seventeen (17 %) of the City of York are Latino, and almost four percent (3.7%) of York County and twenty five percent (25%) of York City are African American.[23]

---

[23] All census statistics are taken from the U.S. Census Bureau, Census 2000. Petitioner's trial took place in 2003, a mere three years after the publication of the census.  Information regarding the race of members of the venire panel is based on information from those who were present at Petitioner's trial, including trial counsel,

A.      The Federal Standard

208.    The right of a defendant to a jury chosen from a representative cross-section of the community is "an essential component of the Sixth Amendment right to a jury trial." Taylor v. Louisiana, 419 U.S. 522, 528 (1975). The fair-cross-section guarantee protects the defendant's right to a fair chance to secure a representative jury, and the perception of fairness in the jury selection system. See, e.g., Williams v. Florida, 399 U.S. 78, 100 (1970) (noting that juries must be selected in a way that provides "a fair possibility for obtaining a representative cross-section"); see also Detre, Note, A Proposal for Measuring Underrepresentation in the Composition of the Jury Wheel, 103 YALE L.J. 1913, 1927 (1994) ("Detre"); Bueker, Note, Jury Source Lists: Does Supplementation Really Work?, 82 CORNELL L. REV. 390, 399 (1997) ("Bueker").

209.    The Supreme Court has long recognized that the jury selection process "must always accord with the fact that the proper functioning of the jury system, and indeed, our democracy itself, requires that the jury be a body truly representative of the community." Glasser v. United States, 315 U.S. 60, 85-86 (1942). Toward this end, the Sixth Amendment requires representative jury pools and panels, but it does

---

and a preliminary investigation. Petitioner requests an evidentiary hearing in order to verify counsel's information and discover the racial background of every member of the venire panel.

not, however, guarantee the "right to be tried by a particular jury which is itself a fair cross-section of the community." United States v. Lewis, 472 F.2d 252, 255 (3d Cir. 1973).

210.    To establish a *prima facie* "fair cross-section violation" under the Sixth Amendment, a defendant must show that (1) the relevant community contains a distinctive group; (2) that the representation of the distinctive group in the venire or jury pool is not fair and reasonable in relation to the population of the group in the community; and (3) that this under representation resulted from systematic exclusion of the group from the jury selection process. Duren v. Missouri, 439 U.S. 357, 364 (1979).    Discriminatory intent is <u>not</u> part of this analysis.    Id. at 368 n.26 (distinguishing Sixth Amendment fair cross-section challenges from equal protection challenges).

211.    Once a defendant makes out a *prima facie* case, the burden shifts to the Commonwealth to rebut the inference of the Sixth Amendment fair cross-section violation.  To meet its burden, the Commonwealth must proffer a significant state interest that is manifestly and primarily advanced by those aspects of the jury-selection process that result in the disproportionate exclusion of the distinctive group. Id. at 367-68.

99

1.     **Hispanics and African Americans are a Distinctive Group in the Community.**

212.   It is beyond question that Hispanics and African Americans are a distinctive group in the community of York City and York County.[24]  See United States v. Weaver, 267 F.3d 231, 240 (2001), quoting Castaneda v. Partida, 430 U.S. 482, 495 (1977) ("it is no longer open to dispute that Mexican-Americans are a clearly identifiable class"); Ramseur v. Beyer, 983 F.2d 1215, 1230 (3d Cir. 1993) (declaring summarily that "African Americans are unquestionably a constitutionally cognizable group").  In the year 2000 - just three years prior to Petitioner's trial - African Americans comprised 25.1% of the population in York city and 3.7% of the population of York County.[25]  Likewise, Hispanics are also a distinctive group in the community, comprising 17.2 % of the population of York city and 3.0% of York County.

---

[24]In 2000 (the U.S. census data closest in time to Petitioner's 2003 trial), the census reported York County as having a total population of 381,751.  Pennsylvania is entitled to designate what constitutes a community for purposes of its jury system, since it has plenary power over that system so long as it does not violate any Constitutional requirements.

[25]  All census statistics are taken from the U.S. Census Bureau, Census 2000. See http://www.factfinder.census.gov.  Those who are Hispanic or Latino comprise 17.2% of the population in York city, or 7,026 people.  Those who are Hispanic or Latino comprise 3%, or 11, 296 of the population in York County.

### 2.      Hispanics and African Americans were Not Fairly or Reasonably Represented in the Venire.

213.    Hispanics and African Americans were clearly under-represented on the jury pool.  Indeed, there was no minority representation whatsoever.  While the touchstone of the under-representation prong of the *prima facie* test is clearly a comparison between the percentage of the distinctive group in the community and the percentage of the group on the jury pool, the Supreme Court has neither articulated a statistical test by which the comparison is to be done, nor set numerical benchmarks.  See, e.g., Duren, 439 U.S. at 364-367.[26]

214.    Courts, in the absence of guidance from the Supreme Court, have used a variety of statistical tests to measure under-representation.  See People v. Smith, 463 Mich. 199, 203-204 (2000) (surveying the development of fair cross-section challenges after Duren).  All of them have been criticized.  Id.; See also Detre, 103 YALE L.J. at 1927-34.  Absolute disparity, [27] the test that courts most commonly rely upon, is widely criticized because it "produces questionable results" in cases where

---

[26]In Duren, the Court simply eyeballed the statistics - women comprised 54% of the population, but only 26.7% of those called for jury duty were women - and found that the prong of under-representation was met.  439 U.S. at 367.

[27]Absolute disparity is calculated by subtracting the percentage of a distinctive group on the jury wheel from the percentage of that group in the community.  Detre, 103 YALE L.J. at 1917.

"the members of the distinctive group comprise a small percentage of those eligible for jury service." People v. Smith, 463 Mich. at 203-204.

215.    Courts compensate for this weakness in absolute disparity by looking at other tests-such as comparative disparity[28] - to balance out the picture. See e.g., Ramseur, 983 F.2d at 1234. This comparative disparity test "imagines how many members of the group in question would be on the wheel if there were full representation, and then calculates the percentage decrease from this figure due to the underrepresentation;" or, put another way, it marks "the percentage decrease in the probability that someone in the underrepresented group will be selected for the jury wheel due to the underrepresentation." Detre, 103 YALE L.J. at 1919.

216.    Despite there being sixty people in the two panels that were considered for Petitioner's jury, not a single member of either panel was Hispanic or African American. While the absolute disparity between the percentage of African Americans in York County and the percentage of African Americans on Petitioner's jury pool was 3.7% and the absolute disparity for Hispanics was 3.0%, the comparative disparity for both Hispanics and African Americans was 100%. This disparity, and the fact that not a single member of the venire panel was African American or

---

[28]Comparative disparity is calculated by dividing the absolute disparity by the population percentage of the group in the community and multiplying by 100%. Detre, 103 YALE L.J. at 1918-19; see also Ramseur, 983 F.2d at 1231.

Hispanic, becomes even more significant when one considers the population of both groups within the city of York.  Hispanics comprise 17% of the population of York city, and African Americans 25%.  When viewed in this context, the complete exclusion of these two distinctive and cognizable groups on the panel is even more inexplicable and patently unconstitutional.

### 3. Hispanics and African Americans were Systematically Excluded from the Jury Selection Process.

217.  The non-representation of Hispanics and African Americans on Petitioner's jury pool mirrors the systematic under-representation- indeed, *non-representation*- of these minority groups on York County jury lists.  To satisfy the third prong fair cross-section *prima facie* test, it is not necessary to show discriminatory intent.  Duren 439 U.S. at 368 n.26.  Rather, the systematic under-representation prong is met when the under-representation is "inherent in the particular jury-selection process utilized." Id. at 366.  In other words, exclusion that results from the system used establishes the third prong, regardless of intent.  Accord Thomas v. Borg, 159 F.3d 1147, 1150 (9th Cir. 1998); United States v. Perez-Hernandez, 672 F.2d 1380, 1384 n.5 (11th Cir. 1982); see also LaRoche v. Perrin, 718 F.2d 500, 503 (1st Cir. 1983), *overruled on other grounds* by Barber v. Ponte, 772 F.2d 982 (1st Cir. 1985).

218.   At the time of Petitioner's trial, York County drew its master list for jury pools from only three of the seven sources used in Pennsylvania: voter registration lists; per capita tax rolls; and income tax rolls.[29]  Despite the fact that York County employs a facially race-neutral approach for selecting members of the jury pool, this method does not result in constitutionally representative venire panels.

219.   The   Joint   State   Government   Commission   Report,   <u>Minority Representation in the Jury Selection Process in Pennsylvania</u>, found in 2003 that York County had an African American population of 3.7%, but African Americans make up only 1.1% of the jury lists.  Similarly, while Hispanics comprised 3.0% of the total population of York County, only 1.2% of Hispanics were included on the jury lists.  The Report found this under-representation of African Americans and Hispanics statistically significant.   <u>See</u>   Joint State Government Commission, <u>Minority Representation in the Jury Selection Process in Pennsylvania,</u> Staff Report (May 2003) at 66, Table 12.

---

[29]Joint State Government Commission, <u>Minority Representation in the Jury Selection Process in Pennsylvania,</u> Staff Report (May 2003) at 70, Table 16.  The other four master list sources documented in the report are: 1) driver's license lists; 2) occupational tax rolls; 3) real estate tax rolls; and 5) high school graduation. <u>Id.</u> Petitioner expects to present evidence that York County has since changed its process of selecting venirepersons to include driver's licences lists and other lists designed to expand the pool of prospective jurors.

220.   In a separate report, the Pennsylvania Supreme Court Committee on Racial and Gender Bias in the Justice System acknowledged that the procedures used in Pennsylvania to compile jury lists result in endemic under-representation: "An examination of the current policies of constructing lists of potential jurors and choosing juries suggests that the policies, whatever their rationale, fail at each step of the process to include a representative number of minorities." Final Report of the Pennsylvania Supreme Court Committee on Racial And Gender Bias In the Justice System at 54 (2003).

221.   The Committee's findings indicate that procedures such as that used in York County fail to compensate for economic factors within the Hispanic and African American communities that lead to under-representation:

> [p]eople in predominantly African American and Latino neighborhoods receive fewer summonses for jury duty, and the number of potential jurors consequently declines because of difficulties with transportation, childcare, and work rules that discourage jury participation by hourly employees.

Id. at 54.

222.   Under-representation of African Americans and Hispanics on jury lists is not only inherent throughout Pennsylvania, as the Pennsylvania Supreme Court Committee found, it is specifically inherent to the method of jury list composition–reliance on voter registration forms–used in York County at the time of

Petitioner's venire.  Scholars quoted in the Joint State Government Commission report, Minority Representation in the Jury Selection Process in Pennsylvania, pointed out that voter registration lists do not represent a fair cross-section:

> [First, a] long tradition of voting research more than suggests that registered voters are not representative of the general population, and therefore, it would be logical to conclude jurors drawn from this source would also be unrepresentative. . . . African-Americans tend to be less likely to vote (and register to vote) than their Caucasian counterparts, and voters tend to be older than nonvoters and more affluent.

Id. at 82.[30]

223.   Moreover, the prohibition on citizens with a felony conviction from serving as jurors also leads to systematic under-representation of minorities on juries, because African-Americans are disproportionately convicted of felonies. See Hunter v. Underwood, 471 U.S. 222 (1985) (striking down a felon disenfranchisement provision on grounds it was a thinly veiled Jim Crow law); Brian C. Kalt, The Exclusion of Felons from Jury Service, 53 AM. U. L. REV. 65 (2003); James L. Buchwalter, Annotation, Disqualification or Exemption of Juror for Conviction of, or Prosecution for, Criminal Offense, 75 A.L.R. 5th 295 (2000); Alice E. Harvey, Ex-Felon Disenfranchisement And Its Influence on The Black Vote: The Need For a

---

[30]Quoting William D. Schreckhise & Charles H. Sheldon, The Search for Greater Juror Diversity: The Case of the U.S. District Court for the Eastern Division of Washington, 20 JUST. SYS. J. 95 at 98 (1998).

Second Look, 142 U. Pa. L. Rev. 1145 (1994).

224.   In Petitioner's case, the York County jury selection system resulted in a jury that completely excluded the African-American and Hispanic communities, thus failing to represent a fair cross-section of York County.   This violates Petitioner's federal constitutional rights.

225.   Additionally and in the alternative, the York County jury selection system procedures have continually failed to represent certain identifiable groups over a period of time, in violation of the federal constitution.  Petitioner has shown that in his case, the York County jury venire failed to represent African Americans and Hispanics, both identifiable groups in the community.  In order to show that such under-representation has occurred over a period of time to demonstrate a pattern and practice of exclusion, Petitioner seeks discovery from the York County authorities detailing the racial makeup of jury venires for the twenty years prior to Petitioner's trial, e.g. 1983-2003.

226.   Petitioner was deprived of his constitutional right to a jury chosen from a fair cross-section of the community, and he is entitled to a new trial.  Trial counsel was ineffective for failing to raise a fair cross-section objection to this blatantly unrepresentative, indeed, non-representative, jury pool.  Reasonably competent counsel would have been familiar with the fair cross-section requirement and the

readily available data demonstrating that York County's procedures were reasonably likely to result in under-representation of minorities.  Even if counsel was not aware of the readily available data, and he should have to competently represent Petitioner in this capital case, he was patently aware of the absence of any minorities once he became familiar with the actual panels called for jury duty in Petitioner's case. Counsel's performance was deficient.  Counsel could have no reasonable basis for failing to object to the unrepresentative composition of Petitioner's jury venire.  Not a single member of the 60-person jury pool was African American or Hispanic. Because constitutional error at voir dire is a structural error entitling habeas petitioners to a new trial, prejudice is demonstrated and relief is required.

227.   Direct appeal counsel was precluded from raising the above-described claims of ineffective assistance of counsel on direct appeal.  See Commonwealth v. Grant, 813 A.2d 726 (Pa. 2002).  To the extent that counsel could have and should have raised the above-described errors on direct appeal under controlling precedent and procedure, counsel's failure to do so constitutes ineffective assistance of counsel in violation of the Sixth, Eighth and Fourteenth Amendments.  Because there is a reasonably likelihood that the results of Petitioner's appeal would have been different had counsel raised the palpable denial of his federal constitutional right to a jury composed of a fair cross-section of the community, prejudice is demonstrated and

relief is required.

## CLAIM XI. NUMEROUS INSTANCES OF PROSECUTORIAL MISCONDUCT, INDIVIDUALLY AND COLLECTIVELY DEPRIVED PETITIONER OF HIS SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS.

228.   The claims and factual allegations set forth in all other sections of this *Petition* are incorporated by reference and realleged as if set forth entirely herein.

229.   The duty of the prosecution in a criminal case is not to win the case, but to seek justice. Berger v. United States, 295 U.S. 78, 88 (1935). As part of his duty to see that justice is done, the prosecutor has a special duty to avoid improper argument to the jury. Because of the prosecutor's prominent courtroom role as representative of the Commonwealth -- and the mantle of respect and authority this role creates in the eyes of the jury -- the jurors are predisposed to give great deference to the prosecutor's words, and improper prosecutorial arguments "are apt to carry much weight against the accused when he should properly carry none." Berger, 295 U.S. at 88; accord Drake v. Kemp, 762 F.2d 1449, 1459 (11th Cir. 1985) ("Arguments delivered while wrapped in the cloak of state authority have a heightened impact on the jury.") (citing Berger). "For this reason, misconduct by the prosecutor...must be scrutinized carefully." Id.; see also United States v. Young, 470 U.S. 1, 7-8 (1985). The prosecutor's obligations and the court's scrutiny are never greater than in capital proceedings.

230.    When the prosecutor's argument infects the trial with unfairness, due process is violated.    Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). Prosecutors have a "heightened duty to refrain from conduct designed to inflame the sentencing jury's passions and prejudices," Lesko v. Lehman, 925 F.2d 1527, 1541 (3d Cir. 1991).    Even where individual remarks by themselves do not create a due process violation, their cumulative effect may.    Id. at 1546.

231.    Moreover, a criminal defendant has a due process right to be tried solely on the basis of admissible evidence and a Sixth and Fourteenth Amendment right not to be convicted except upon a jury determination based upon proof of every element of the offense proven by record evidence beyond a reasonable doubt.    Chandler v. Florida, 449 U.S. 560, 574 (1981); United States v. Gaudin, 515 U.S. 506, 514 (1995).

232.    The very nature of a capital case demands heightened scrutiny.    "Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two.    Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." Woodson v. North Carolina, 428 U.S. 280, 305 (1976); Gregg v. Georgia, 428 U.S. 153, 189 (1976); Lesko v. Lehman, 925 F.2d 1527, 1541 (3d Cir. 1991).    In these cases the prosecutorial argument should be

given heightened scrutiny.  See also Christy v. Horn, 28 F. Supp.2d 307, 319 (W.D. Pa. 1998).

233.   The prosecutor's argument and examinations throughout the trial and sentencing phase in Petitioner's case violated these fundamental tenets of capital jurisprudence.  These actions by the prosecutor, both individually and collectively, violated Petitioner's separate and distinct constitutional rights.

## A.   The Prosecutor Presented False and Misleading Argument and Testimony to the Jury.

234.   Throughout the evidentiary presentation and argument in this case, the prosecutor elicited and presented patently false and misleading testimony and argument while at the same time withholding critical information from the jury that could have resulted in an acquittal, or, at a minimum, a conviction of less than first degree murder.

### 1.   The prosecution's failure to inform the jury that Milton Montalvo had been previously found by another jury to be the person who had committed the murders.

235.   As described more fully in Claim I, *supra*, prior to Petitioner's trial, while the prosecution did present evidence to Petitioner's jury that Milton Montalvo had been convicted of the murders of Miriam Ascencio and Manuel Santana, neither the prosecution, the court or defense counsel ever informed the jury that Milton Montalvo's jury specifically found that he, Milton Montalvo, was the individual who

had actually committed the murders.  Indeed, when Petitioner's counsel attempted to make the jury aware of this fact during jury selection, the prosecution objected, knowing the critical impact such facts would have on a jury. The court sustained the prosecution's objection.[31]   Had Petitioner's jury been made aware of this fact, there is a reasonable likelihood that they would have found Petitioner innocent, or, at least, guilty of a lesser charge than first degree murder for the homicide of Miriam Ascencio.

### 2.    The prosecution deliberately misled the jury.

236.    The prosecutor also committed misconduct when he deliberately misled the jury about the testimony and evidence that would be presented in Petitioner's case.  One of the more egregious instances occurred during the prosecutor's opening statement, when he misinformed the jury about the testimony of Miguel and Esther Soto.  The prosecutor  stated  "the *owners* of the grocery store ultimately told the police officers . . . *we* knew the Defendant and his brother, earlier in the day of the

---

[31]See NT Vol. I at 87:

Cutruzzula:    You remember that the charges are about a murder case and that [Petitioner]'s charged with murdering Miriam Ascencio and Nelson Lugo also known as Nelson Santana.  His brother has already been convicted of murdering those two people?

Kelley:    Objection, he was convicted of those crimes.  *No jury has even pronounced who the murderer of these was.*

homicide *they both* spoke about killing Miriam Ascencio." NT Vol. II at 114; also at 115 ("they said and this Defendant said I killed Miriam"). The prosecutor knew full well when he made this statement that Miguel Soto never said that Petitioner ever talked about killing anyone (which was precisely why he was called on behalf of the defense rather than the prosecution). Indeed, when Mr. Soto testified for the defense, he directly contradicted his wife's testimony that Petitioner purportedly said he killed anyone. NT Vol. IV at 243:

> Q:    "Did the Italiano[32] say anything to you about Milton's wife?
>
> A:     "No, he never said anything to me."
>
> Q:     "Did he ever threaten her life?"
>
> A:    "No, not that I know of."
>
> Q:    "Did he ever say he was going to kill her?"
>
> A:     "No, he never said that to me."

237.   In fact, not only did Petitioner never threaten or admit to killing the victim in Mr. Soto's presence, but Mr. Soto testified that Petitioner wasn't even angry when he saw him in the store the day of the murders. Id.  Mr. Soto further testified that later that evening, when Petitioner and his brother arrived at Mr. Soto's home, while Milton Montalvo admitted to killing his wife, Petitioner was "silent." Id. at 246.

---

[32]Mr. Soto called Petitioner "Italiano."

Miguel Soto was firm in his answer even on cross examination by the prosecution, where he was asked once again whether Petitioner confessed anything to him, and he replied in the negative. NT Vol. IV at 258 (Q: "And just so it's clear, the Defendant never confessed anything to you? A: "No, not to me. He never said anything.").

238.   To buttress its theory that there were two killers and that Petitioner killed Miriam Ascencio and Milton Montalvo killed Manuel Santana, and also in an attempt to explain why there was not a shred of blood, hair, or other physical evidence to link Petitioner to the scene, the prosecution also misrepresented the forensic testimony that would be presented to the jury. In its opening, the prosecutor told the jury that Miriam Ascencio wasn't stabbed but was just hit with a blunt object, and as a result, did not sustain any sharp force injuries. NT Vol. II at 118. When the medical examiner, Sarah Funke, M.D., actually testified, she directly contradicted the prosecutor's remarks, explaining that while Ms. Ascencio had multiple blunt force injuries, "she also had sharp force injuries on her neck." NT Vol. IV at 91, "some signature sharp force injuries to her neck, id. at 96.

239.   Not willing to let anything - even his own forensic expert - detract from his theory that there were two killers and that Petitioner's blood wasn't at the scene because he only used a blunt object to kill Miriam Ascencio, the prosecutor misrepresented Dr. Funke's testimony that Ms. Ascencio had also been subjected to

sharp force trauma and again reiterated in his closing argument that Ms. Ascencio was "not hit with anything sharp."   NT Vol. IV at 307.[33]

240.    The prosecutor also committed misconduct when he failed to correct the testimony of Beth Ann Giles, the Pennsylvania State Police DNA Lab Analyst, when she incorrectly identified blood found on the outside of the bedroom door as Noel Santana's. NT Vol. IV at 153.  Ms. Giles never explained that when she mistakenly referred to *Noel* Santana, she was referring to the victim, not Petitioner.  No one clarified this mistake for the jury.   As a result of this material misstatement, there is a reasonable probability that the jury concluded that Ms. Giles was actually talking about Petitioner, Noel Montalvo, and that it was his blood that was found at the crime scene.

241.   This error was exacerbated when, at the conclusion of her testimony, when asked whether any of the items of evidence came back to the Defendant, Ms. Giles stated "I *included* Noel Montalvo *as being associated* with none of the items that I looked at."   NT Vol. IV at 157.  By stating that Petitioner was "included" and "associated," especially given her earlier misstatement calling the victim "Noel," there is a reasonable likelihood that the jury interpreted this garbled testimony to

_____

[33]The prosecutor did acknowledge the stab wounds to the female victim later in his closing argument.  NT Vol. IV at 308.

mean that there was physical evidence linking Petitioner to the homicides.  The prosecutor had a duty to correct this material misstatement.  Alternatively, trial counsel should have objected to this misstatement, and, in the absence of such an objection, the trial court should have *sua sponte* corrected the error.  The failure to do so prejudiced Petitioner.

242.  In addition to misleading the jury regarding the relevant forensic evidence, the prosecutor also improperly introduced evidence that was completely irrelevant and material and served no legitimate purpose other than to confuse the jury.  After the forensics experts had testified concerning the utter absence of any blood, fiber, hair, saliva, or other physical evidence linking Petitioner to the homicides, the prosecution then presented the testimony of Detective Dennis Williams, a primary detective on the case and fingerprint analyst.  The sole thrust of Detective Williams' testimony regarding fingerprints was that a print was found on a stove top but there were insufficient characteristics to make an identification of the print.  NT Vol. IV at 188.  While Detective Williams did point out that it was determined that the blood in the area belonged to Manuel Santana, and therefore the print was also most likely his, the prosecution hammered home the point that there were not enough characteristics to identify the print to a reasonable degree of scientific certainty.  Id. at 189.

243.   There was absolutely no legitimate reason (or proper foundation) to present this irrelevant  "non-evidence" other than to imply that because the print could not be identified, there was a possibility that it could belong to Petitioner.   As a result of counsel's investigation, Petitioner expects to present at an evidentiary hearing testimony demonstrating that at least one juror believed that one of Petitioner's fingerprints was found at the scene and the only source of this misapprehension of the evidence is this record exchange.   The prosecution was constitutionally obligated to correct the obvious misapprehension arising from this testimony.   Moreover, counsel's failure to do so constituted prejudicially deficient performance.

244.   Even after all the evidence and testimony was presented, the prosecution continued its pattern of misrepresentations and half truths in an effort to confuse the jury.   When talking about the blood that was found at the scene (not a drop of which could be linked to Petitioner), the prosecutor referred to Petitioner's brother, Milton Montalvo as "the Defendant," even though he was not on trial:

> . .the only blood that you heard of on that white rag that was wiped and thrown on the bed was *the Defendant, Milton Montalvo's,* blood and that's it. Why? *Because Defendant - Milton Montalvo* didn't go like this (indicating) as all her blood came gushing out in order for her to die literally within 30 seconds. *The Defendant did that.*

245.   Given the confusing nature of the forensic testimony that had been presented and trial counsel's ineffective failure to object or request a curative instruction to clarify this testimony as set forth above, by continually referring to "The Defendant" and "Milton Montalvo" in the same phrase, the prosecutor confused the jury as to which Montalvo did what, resulting in a reasonable likelihood that the jury relied on the material misstatement in reaching its verdict.

246.   Finally, the prosecutor presented the testimony of Esther Soto at Petitioner's trial, yet during closing argument at Milton Montalvo's trial, the prosecutor argued to that jury that "what Esther Soto said to you the other day was a lie."  NT Trial of Milton Montalvo, Vol. VII at 1212.

247.   The prosecution has a duty to avoid presenting false or misleading testimony, and to correct false or misleading testimony.  Giglio v. United States, 405 U.S. 150 (1972); Napue v. Illinois, 360 U.S. 264 (1959).   By introducing the testimony of Esther Soto, whom he called a liar at Petitioner's brother's trial, the prosecutor exceeded the bounds of fairness and denied to the Petitioner due process of law.

248.   Petitioner suffered prejudice as a result of the improper admission of this false and misleading evidence and argument.  Trial counsel was ineffective for failing to object,  seek cautionary instructions or request a mistrial because of the prejudicial

and inflammatory references. Appellate counsel was also ineffective for failing to properly raise these issues on post-verdict motions and direct appeal. A new trial is required.

**B.    The Prosecution Committed Misconduct By Introducing Irrelevant and Inflammatory Evidence Solely Related to the Guilt of Milton Montalvo.**

249. The prosecution also committed misconduct in its presentation of irrelevant and inflammatory evidence that was solely related to Milton Montalvo in what turned out to be a successful effort to poison the jury against Petitioner.

250. Despite having absolutely no relevance whatsoever to the case against Petitioner, the prosecution presented the following argument and testimony:

- the common law marriage between the victim and Milton Montalvo had dissolved "because Milton Montalvo was doing drugs and was offering nothing to the relationship other than heartache, sorrow, and demanded upon Miriam and her pocketbook," NT Vol. II at 109 (opening statement of ADA Kelley);

- Miriam threw Milton out of her apartment just prior to the crime, and that she had her son put a padlock on the door because "she was concerned that Milton had been stealing things from her home," id;

- Milton was angry with Miriam because she had thrown him out and was dating another man, the other victim in the case, id. at 110-11;

- after the crime, Milton was arrested in Florida during a prostitution sting, id. at 115;

- at the time of his arrest, Milton was carrying fake identification and tried to throw it away to avoid capture, id. at 116;

119

- several witnesses heard Milton's voice outside the victim's apartment that night, NT Vol. II at 235, 246 (Testimony of Vincent Rice); <u>id.</u> at 292 (Testimony of Fidelio Morrell);

- Milton and Miriam had a stormy and violent relationship, and neighbors would often hear yelling and banging and arguments in the apartment, NT Vol. II at 248 (Testimony of Vincent Rice); <u>id.</u> at 294 (Testimony of Fidelio Morrell);

- Milton was "visibly upset and agitated," "sweating profusely" and "hyped up" the night of the crime, NT Vol. II at 270 (Testimony of Officer Lisa Daniels);

- Milton was screaming at Miriam on the phone earlier on the day of the crime, saying he would "kill her," NT Vol. III at 8 (Testimony of Esther Soto);

- DNA evidence from blood and hair found at the scene and on the male victim that conclusively matched Milton Montalvo, NT Vol. IV at 41 (Testimony of Detective Scott Hose); NT Vol. IV at 131 (Testimony of Chris Anne Arrotti); NT Vol. IV at 148-49 (Testimony of Beth Ann Giles).

251. The prosecution's admission of this patently irrelevant evidence, for the sole purpose of convicting Petitioner on the basis of "guilt by association," violated Petitioner's separate and distinct federal constitutional rights to a fair trial, to a jury determination based on competent, reliable evidence as opposed to speculation and conjecture, to present a defense and to due process. Counsel was ineffective for failing to object to the improper presentation of this argument and testimony, and the trial court erred in allowing its admission. The prejudice is obvious. By presenting

the overwhelming evidence connecting Milton Montalvo to the murders, the prosecution sought to convict Petitioner on a "guilt by association" theory. Thus, prejudice is demonstrated and relief is required.

### C.   The Prosecutor's Improper, Misleading, and Inflammatory Opening and Closing Remarks Far Exceeded the Bounds of Permissible Oratorical Flair.

252.   During opening statements, it is the prosecutor's duty is to explain to the jury the *evidence* that will be presented in the case.  See ABA Standard 3-5.5 for the Prosecution Function ("The prosecutor's opening statement should be confined to a statement of the issues in the case and the evidence the prosecutor intends to offer which the prosecutor believes in good faith will be available and admissible.").

253.   In Petitioner's case, rather than focus on the evidence that would be presented, the prosecutor pummeled the jury with false and misleading rhetoric about the victims, which, in addition to being patently untrue, served no legitimate purpose other than to arouse the passions and prejudices of the jury against Petitioner.

254.   In describing the victims, the prosecutor improperly pandered to the jurors' sense of patriotism and ethnocentrism:

> they are two individuals that came to the country, the United States in order to enjoy some of the freedoms and the experiences that you and I take for granted . . .

> You may all have gone up to New York and seen the Statue of Liberty, that tourist attraction.  To people from our culture not only is that a great

tourist attraction but that is symbol-like for everything that you and I may not hold dear because we've been experiencing it for our entire lives.

The Statue of Liberty means freedom. Freedom that we as Americans enjoy every single day. Miriam Ascencio and Nelson Lugo came to this country to experience some of that freedom that you and I enjoy everyday. Both of those individuals when they came to this country to enjoy what we enjoy they ended up being killed, murdered, the ultimate absence of freedom.

NT Vol. II at 109. The prosecutor's rhetoric about the victims' backgrounds was patently false and misleading to the jury. Listening to this diatribe, the jury was led to believe the victims had fled from some impoverished, war torn, dictatorship. In actuality, Miriam Ascencio was from Puerto Rico, a *United States territory*. As a citizen of Puerto Rico, Miriam Ascencio was also a United States citizen. Hence, any "freedoms" she may have come to this country to enjoy were no different than those she enjoyed in Puerto Rico. Similarly, Manuel Santana was from the Dominican Republic, the Caribbean's largest tourist destination and second largest economy in the Caribbean.[34]

255.   The prosecutor also improperly bombarded the jury with irrelevant and inflammatory graphic images of the victims, describing how they were "slaughtered," NT Vol. II at 109, 118; "butchered," id. at 118; and provided the jury with a vivid

_____

[34]Http://www.state.gov/r/pa/ei/bfn/35639.htm (noting that economy of the Dominican Republic "boomed" in the 1990's).

visual of the female victim with a "blood covered face where the orbit had been punched out of her eye," NT Vol. II at 113.  The prosecutor also provided a detailed and graphic description of the male victim's injuries, id., even though the prosecution theory and theme throughout case was that Petitioner's brother, Milton Montalvo, had killed the male victim and Petitioner had killed the female victim.

256.   These graphic and violent references served no legitimate purpose other than to inflame the jury.  The prosecutor's remarks created an intolerable risk that the jury's deliberations were distorted by prejudice which prevented Petitioner from receiving a fair trial. The comments also constituted an improper appeal to fear, anger and sympathy in the hearts and the minds of the jury, which rendered Petitioner's capital trial fundamentally flawed, prejudiced and unfair.

**D.    Counsel's Failure to Object to the Prosecutor's Improper, Inflammatory, Misleading Remarks and Evidentiary Presentation, Request a Curative Instruction, and Raise and/or Litigate This Claim Constitutes Prejudicially Deficient Performance in Violation of the Sixth, Eighth and Fourteenth Amendments.**

257. As set forth above, Petitioner has presented a numerous instances of prosecutorial misconduct that violated Petitioner's separate and distinct federal constitutional rights.  Any failure on the part of trial and/or appellate counsel to properly raise, preserve, and litigate this issue in state court constitutes prejudicially deficient performance in violation of Petitioner's federal constitutional rights.

123

258.   The prosecutor's comments and arguments in this case were not simply isolated instances of prosecutorial excess.   Individually and cumulatively, the prosecutor's remarks resulted in the denial of due process, a fair trial and a jury determination based on evidence rather than conjecture, speculation, passion and prejudice.  Neither counsel nor the court took any steps to cure any of these errors. The trial court's failure to correct any of the above errors, or to immediately instruct the jury as to their impropriety, contributes to and exacerbates the federal constitutional violations.

259.   These errors compromised the reliability of the verdict and sentencing determination and deprived Petitioner of his  rights under the Sixth, Eighth and Fourteenth Amendments.  Counsel's failure to object, request a limiting instruction, or properly raise and preserve these issues denied petitioner his right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 694 (1984); Williams v. Taylor 529 U.S. 362 (2000).

260.   Direct appeal counsel was precluded from raising the above-described claims of ineffective assistance of counsel on direct appeal.  See Commonwealth v. Grant, 813 A.2d 726 (Pa. 2002).  To the extent that counsel could have and should have raised the above-described errors on direct appeal under controlling precedent and procedure, counsel's failure to do so constitutes ineffective assistance of counsel

124

in violation of the Sixth, Eighth and Fourteenth Amendments.  The same standards apply to claims of appellate ineffectiveness.  See, e.g. Roe v. Flores-Ortega, 528 U.S. 470 (2000) (applying Strickland standard to consideration of appellate counsel's ineffectiveness); United States v. Mannino, 212 F.3d 835 (3d Cir. 2000); Orazio v. Dugger, 876 F.2d 1508, 1513 (11th Cir. 1989); Matire v. Wainwright, 811 F.2d 1430, 1435 (11th Cir. 1987).  Where, as in this case, there is a "reasonable probability that the neglected claim[s] would have succeeded on appeal, [] counsel's failure to raise the claim f[alls] outside the range of reasonably competent assistance." Claudio v. Scully, 982 F.2d 798, 799 (2d Cir. 1992); Jackson v. Leonardo, 162 F3d. 81, 85 (2d Cir. 1998) (appellate counsel's failure to raise "sure winner" constituted ineffective assistance: "In the instant case, we believe that appellate counsel's failure to raise a well- established, straightforward, and obvious . . . [claim] . . . constitutes ineffective performance."); Freeman v. Lane, 962 F.2d 1252, 1258-58 (7th Cir. 1992) (appellate counsel ineffective for failing to raise a meritorious claim that was "presented squarely" at trial regarding a violation of the defendant's Fifth Amendment rights); Murphy v. Puckett, 893 F.2d 94, 96-97 (5th Cir. 1990) (counsel's failure to raise valid defense at trial and on direct appeal constituted ineffective assistance).  Accordingly, for this reason as well, relief is required.

125

## CLAIM XII. THE TRIAL COURT'S GUILT PHASE INSTRUCTIONS VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS. TRIAL AND APPELLATE COUNSELS' FAILURES TO LITIGATE THESE ERRORS CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL.

261.    The matters set forth in all other sections of this *Petition* are repeated and realleged as if set forth entirely herein.

262.    The trial court made a number of serious errors in its charge to the jury. As explained below, each error implicated a constitutional protection, and counsel ineffectively failed to object, to attempt to correct the error, or to raise it in post-verdict motions or on direct appeal.

### A.    General Principles of Law

263.    A capital defendant has a Sixth, Eighth, and Fourteenth Amendment right to a verdict based solely upon properly admitted record evidence interpreted in accordance with the applicable law.

264.    Due process affords the defendant a "right to a verdict based solely upon the evidence and the relevant law." Chandler v. Florida, 449 U.S. 560, 574 (1981). Due process requires – as a right "of surpassing importance" – that the State (through properly admitted evidence interpreted in accordance with the law) must prove beyond a reasonable doubt each and every element of the crimes with which he has been charged. Apprendi v. New Jersey, 530 U.S. 466, 477 (2000); Victor v.

126

Nebraska, 511 U.S. 1, 5 (1994); Sullivan v. Louisiana, 508 U.S. 275, 278 (1993);

Francis v. Franklin, 471 U.S. 307, 315 (1985); Sandstrom v. Montana, 442 U.S. 510,

520-22 (1979); Mullaney v. Wilbur, 421 U.S. 684, 692-96 (1975); In re Winship, 397

U.S. 358, 364 (1970).

265.    This right is protected not just by due process.  The Sixth Amendment

right to trial by jury also "indisputably entitle[s]" a defendant to a jury determination

of all the elements of each offense beyond a reasonable doubt.  Apprendi v. New

Jersey, 530 U.S. 466, 476-77 (2000).  When a defendant is afforded a jury trial, "the

jury's constitutional responsibility is not merely to determine the facts, but to apply

the law to those facts and draw the ultimate conclusion."  United States v. Gaudin,

515 U.S. 506, 514 (1995).  The state-law grant of a jury trial therefore also vests in

the defendant a Fourteenth Amendment life and liberty interest in a verdict that is a

product of the process state law requires.  Hicks v. Oklahoma, 447 U.S. 343, 346

(1980);[35] Dupuy v. Butler, 837 F.2d 699, 703 (5th Cir. 1988).

---

[35]Hicks states:  "Where . . . a State has provided for the imposition of criminal
punishment in the discretion of the trial jury, it is not correct to say that the
defendant's interest in that discretion is merely a matter of state procedural law.  The
defendant in such a case has a substantial and legitimate expectation that he will be
deprived of his liberty only to the extent determined by the jury in the exercise of its
statutory discretion, . . . and that liberty interest is one that the Fourteenth
Amendment preserves against arbitrary deprivation by the state."  447 U.S. at 346.

266.   Together, these principles entitle a defendant to a jury determination of guilt or innocence based solely on the evidence properly admitted at trial and proven (or not) to the jury unanimously and beyond a reasonable doubt, free of prejudicial extra-record considerations.

267.   In addition, when a defendant is on trial for his life, the Eighth Amendment requires the State to "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.'" Godfrey v. Georgia, 446 U.S. 420, 428 (1980).   Because the State "has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty," id., a capital conviction that is based upon considerations outside the record, the law, or the appropriate scope of the jury's fact-finding responsibilities is unconstitutionally arbitrary and capricious.

268.   For these rights to be effectuated in a capital trial, it is critical that the jury be properly instructed.   In this case, however, these overarching rights, and more discrete rights set forth below, were violated by a series of instructional errors by the trial court.

## B.   The Trial Court Improperly Instructed the Jury Concerning Evidence that Was Not Admitted or Presented in the Case.

269.   As set forth above, a defendant has an absolute right to a verdict based

solely upon properly admitted evidence. Here, however, in explaining to the jury its fact-finding obligations, the court erroneously informed the jurors: "[I]f you find that there was evidence that was not admitted and that you think is important, then you've got to consider that. I can't answer why it wasn't admitted." NT Vol. V at 4.

270. This was clear error. If evidence was presented that was inadmissible, the jury was precluded from considering it. Instead, the court's instruction not only invited the jury to speculate about this evidence, but expressly required it to consider what it legally could not. If the court simply misspoke, and meant to say "presented" rather than "admitted," that does not alleviate the problem. The jury *heard* admitted, and it is presumed to follow the instructions it heard. Further, the court erred even if the jury understood the court to have meant that it was *required* to consider ("you've got to") that evidence. While the jury certainly *may* consider that a defendant did not present evidence, its focus must be on the Commonwealth's proof and nothing requires that the jury has "got to consider" such evidence.

271. As the instruction was constitutionally flawed, trial counsel's failure to object to the instruction or litigate this issue on appeal constituted deficient performance. Because this error went to the heart of the jury's determination, it fatally compromised the reliability of the verdict. Petitioner is entitled to relief.

**C.    The Trial Court's Instructions Explained Reasonable Doubt in a Manner That Would Have Required The Jury to Decline to Act, Rather than Merely Hesitating Before Acting, Improperly Diminishing the Commonwealth's Burden of Proof.**

272.    The trial court initially instructed the jury that "A reasonable doubt is a doubt that would cause a reasonably sensible person to pause or hesitate before acting upon a matter of importance in his or her own affairs." NT Vol. V at 5.  However, the court then provided the jury with an illustration of reasonable doubt that suggested that the doubts must not cause just hesitation or pause, but a particular type of hesitation or pause sufficient to prevent or terminate action altogether.  In so doing, the court erected an unconstitutionally high threshold before a jury's doubts as to guilt could be considered reasonable doubts.  In so doing, it unconstitutionally diminished the Commonwealth's burden of proof.

273.    The court's illustration was as follows:

> In further explanation of reasonable doubt, let me give you a sample.  Three years ago I wanted to go and look for a farm because I wanted to raise dogs.  I found a great farm, nine acres and I said, that's great for my dogs to run on.  I wanted to go and check this farm out.
>
> And when I went into the basement of the farm – of the farm house, I saw that there was damage to the walls.  And me being the daughter of a home builder, I knew right away that the basement had substantial leaks of some sort of substance and I didn't think that it was water because it was kind of an oily substance that came from the walls, it was an old stone wall.

And when I looked at that, I had a reasonable doubt that caused me to pause and hesitate before acting upon a matter of importance in my own affairs, the buying of the house. **As it turned out, I didn't buy that house**. Why didn't I buy that house? Because I had a reasonable doubt.

274.    That illustration, requiring doubts sufficient to prevent action, erected too high a threshold for reasonable doubt. Indeed, the fact that a person saw what appeared to be damage to the walls of the house could be evidence sufficient for a reasonable doubt. But the reasonable doubt would have been evidence suggesting the need for more information before deciding how to act, rather than refusing to move forward altogether. A reasonable doubt would have been a hesitation or pause realizing that a home inspection or a closer review of the walls or the foundation was necessary before acting. That lesser level of hesitation or pause generated by the need for more information was already reasonable doubt, not a doubt that forced the jury to stop altogether in its tracks.

275.    On its face, the "hesitate" jury instruction would have been constitutionally permissible. Victor v. Nebraska, 511 U.S. 1, 20 (1994) (citing Holland v. United States, 348 U.S. 121, 140 (1954); Hopf v. Utah, 120 U.S. 430, 439-41 (1887)). The Court has approved of reasonable doubt instructions that defined the term as "the kind of doubt . . . which you folks in the more serious and important affairs of your own lives *might be willing to act upon*." Holland, 348 U.S. at 140.

This is "not a mere possible doubt . . . [but] that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge." Victor, 511 U.S. at 7. It must be "an actual and substantial doubt reasonably arising from the evidence, from the facts or circumstances shown by the evidence, or from the lack of evidence on the part of the State, as distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture." Id. at 18.

276. But "hesitate" means a "*pause* or other sign of indecision *before acting*." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1061 (1976). An explanation that requires this initial hesitation to be so great that it is followed by a decisive termination of action, rather than a pause before further action, erects a much higher level of doubt than is allowed by due process. It changes the formulation in Holland from a doubt that "leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge" to one in which they **can say,** with some degree of conviction, **that the charge is false.** As such, the illustration was of the character of the instruction struck down in Cage v. Louisiana, 498 U.S. 39, 40 (1990), that "[i]t must be such doubt as would give rise to a grave uncertainty, raised in your mind by reasons of the unsatisfactory character

of the evidence or lack thereof."

277.   The trial court's instruction in this case, improperly required doubt to rise to a level that would prevent a juror from acting rather than merely cause the juror to "hesitate" before acting, unconstitutionally diminished the Commonwealth's burden of proof, and infringed upon the presumption of innocence, in violation of Petitioner's Fifth, Sixth, and Fourteenth Amendment rights.

278.   As the instruction was constitutionally flawed, trial counsel's failure to object to the instruction or litigate this issue on appeal constituted deficient performance.  Because this error went to the heart of the jury's determination, it fatally compromised the reliability of the verdict.  Petitioner is entitled to relief.

### D.   The Trial Court's Erroneous Direction to Convict Even If the Commonwealth Has Not Sustained Its Burden of Proof.

279.   After its erroneous and constitutionally prejudicial illustration of reasonable doubt, the trial court compounded the error with an apparent misstatement that essentially directed a verdict of conviction.  The court instructed:

> So if the Commonwealth has not sustained it's [sic] burden to that level, the burden of proving the Defendant guilty beyond a reasonable doubt, then your verdict must be guilty.  If, in fact, that you find that the Commonwealth has proven its case beyond a reasonable doubt, then your verdict should be guilty.

NT Vol. V at 6.

280.   However, if the Commonwealth has not sustained its burden to the level of proving the Defendant guilty beyond a reasonable doubt, the jury's verdict must be **not guilty**, the precise opposite of the court's instructions.   In effect, the instruction directed conviction:  if the evidence is insufficient, the jury must convict; if the evidence is sufficient, the jury must convict.

281.   As the instruction was constitutionally flawed, trial counsel's failure to object to the instruction or litigate this issue on appeal constituted deficient performance.   Because this error went to the heart of the jury's determination, it fatally compromised the reliability of the verdict.   Petitioner is entitled to relief.

### E.   The Trial Court's Erroneous Instruction that the Jury's Job Was to Decide What Actually Occurred.

282.   Having previously erroneously informed the jury to look beyond the evidence that had been admitted, the court again prejudicially misspoke concerning the role of the jury in determining the ultimate facts.

283.   Petitioner was entitled to "a verdict based solely upon the evidence and the relevant law."  Chandler, 449 U.S. at 574 (1981).  Instead, the court instructed,

> Basically, what your job is, is to decide what actually occurred on the morning of April 19th, 1998.  You have to decide what took place. You're the fact finders. And once you decide what took place, you have to then take the law that I give to you and apply it to those facts in deciding whether the Commonwealth has proven the Defendant guilty beyond a reasonable doubt.

134

NT Vol. V at 8.

284.   The jury's job, however, was most decidedly *not* "to decide what actually occurred" or "what took place."  Its job was to decide what the Commonwealth had or had not proven beyond a reasonable doubt.  Nor was it the jury's job to "decide what took place" and then filter it through the law as given by the court.  It's job was to use that law to decide what material facts had been proven and after having determined what facts had been proven beyond a reasonable doubt, to decide whether the Commonwealth had met its burden.

285.   The court's erroneous instructions, considered together, led the jury to believe that it was to resolve doubts as to what had occurred by reaching beyond the evidence presented and to figure out what actually had occurred.  Then, having figured out what had occurred outside the prism of the legal responsibility to assess each fact for proof beyond a reasonable doubt, it would apply the law to see if its version of the facts justified a conviction beyond a reasonable doubt.  This denied Petitioner a trial based upon the evidence and jury findings of material fact beyond a reasonable doubt.

286.   As the instruction was constitutionally flawed, trial counsel's failure to object to the instruction or litigate this issue on appeal constituted deficient performance.  Because this error went to the heart of the jury's determination, it

fatally compromised the reliability of the verdict.  Petitioner is entitled to relief.

**F.    When the Trial Court Decided to Instruct on Lesser Degrees of Murder, Its Failure to Provide an Instruction on Third Degree Murder Was Reversible Error; Trial Counsel was Ineffective in Failing to Request a Instruction on Third Degree Once the Court Had Decided to Instruct on Second Degree.**

287.    After the close of evidence, Prosecutor Kelley requested that the court instruct the jury on the lesser offense of second degree murder in addition to instructing on first degree.  NT Vol. IV at 278.  The defense objected, taking the position that "it's all or nothing.  Either he killed them or was there when they were killed and helped his brother or he didn't."  Id.

288.    The trial court granted the Commonwealth's request for an instruction on a lesser degree of murder, NT Vol. IV at 280, and instructed as follows:

> He's charged with the taking of a life of Miriam Ascencio and Nelson Lugo by criminal homicide.  There are three possible verdicts that you might reach in this case.  Not guilty, or guilty of murder of the first degree or guilty of murder of the second degree and you'll decide what murder of first degree is and what murder of the second degree is.
> * * * *
> So three possible verdicts: Not guilty of either, first or second – or guilty of first or guilty of second degree.

NT Vol. V at 18, 20.

289.    At that point, having decided to instruct on at least one of the lesser offenses that was supported by the evidence (second degree murder), the court should also have instructed on other lesser offenses that were supported by the evidence, and

136